NYMAN & SCHULTZ *v.* UNITED STATES (No. 2815)[1]

UNFINISHED SAFETY RAZOR BLADES—BANDS AND STRIPS OF STEEL.

> Thin strips of steel, an inch wide, in rolls of 10 or 12 pounds, perforated at intervals to fit a Gillette safety razor, to be finished into safety razor blades by breaking, grinding, and honing, are classifiable under paragraph 358, Tariff Act of 1922, as "unfinished blades for safety razors," rather than as bands or strips of steel under paragraph 313, steel in strips under paragraph 316, or manufactures of metal under paragraph 399, notwithstanding that they are also used to some extent for making knives and scrapers.

United States Court of Customs Appeals, March 9, 1927

APPEAL from United States Customs Court, T. D. 41633

[Affirmed.]

*Allan R. Brown* for appellants.

*Charles D. Lawrence*, Assistant Attorney General (*Oscar Igstaedter*, special attorney, of counsel), for the United States.

[Oral argument January 27, 1927, by Mr. Brown and Mr. Igstaedter]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

BLAND, Judge, delivered the opinion of the court:

This appeal involves the proper classification of rolls of long perforated strips of cold-rolled steel, tempered, polished, and punched, and of a quality, width, and thickness required for safety-razor blades.

The merchandise was assessed for duty as unfinished blades for safety razors at 1 cent each and 30 per centum ad valorem, under paragraph 358, of the Tariff Act of 1922, which, in part, is as follows:

> * * * razors and parts thereof, finished or unfinished, * * *: *Provided*, That finished or unfinished blades for safety razors shall pay a duty of one cent each and 30 per centum ad valorem: * * *

Appellants claim the merchandise to be dutiable at 25 per centum ad valorem under the provision for bands and strips of steel in paragraph 313, or at the same rate under the provision for steel in strips in paragraph 316, or 40 per centum ad valorem for manufactures of metal in paragraph 399. Appellants contend that, if dutiable under either paragraph 313 or 316, the merchandise is subject to

---

additional duty of two-tenths of 1 cent per pound provided for in the last proviso of paragraph 315.

In the condition imported, the merchandise is in rolls weighing probably 10 or 12 pounds, each roll consisting of a very thin strip of highly polished steel 1 inch wide, perforated. The perforations consist of a straight row of holes running the entire length of the strip and in the middle thereof. The holes are in sets of three, separated by a space of approximately three-fourths of an inch, the two spaces between the three holes being about one-fourth of an inch wide. The center hole of the three is round, while the two end holes are oblong, having round ends with flat sides. The merchandise was made in Sweden. The strips are rods which were cold-rolled and hot-rolled. The perforations are punched and afterwards the strips are treated with heat and are hardened and tempered, and then polished, which brings them to the condition in which they are imported. They are punched while the metal is soft, as it would be impracticable to punch them after tempering them, since the brittle steel would break.

In this country the strips of steel are put into a machine which breaks them into pieces approximately the size of the finished razor blade. They must be broken in the wide spaces between the series of three holes. From a thousand to fifteen hundred of these rectangular pieces are locked into a chuck and clamped very tightly together so as to present as nearly as possible a solid mass. They are then put into automatic grinding machines and revolved at a high rate of speed, and the ends of the same are ground to a round or oval form. When they are this far finished, they are in the exact shape of Gillette razor blades, except they are without cutting edges. The cutting edges are made by taking off sufficient metal from the sides to make an edge on each side of the strip. It then goes through a process of honing which takes away the wire edge. It is next stropped on canvas and leather automatically so as to clean it of the wire edge and give it the edge for shaving. It is then a finished razor blade. Many rejects or imperfectly edged blades are sorted out and thrown away.

The record consists of more than 100 pages and most of the testimony was devoted to an effort to prove that, commercially, band steel, or strip steel, included the merchandise at hand.

It is the contention of importers that they have established that the merchandise in question is band steel within the meaning of paragraph 313, and is steel in strips covered by paragraph 316, and that it is not unfinished razor blades.

. The Government not only contends that it is not band steel or steel in strips within the meaning of either of the above referred to

paragraphs, but that, if it is covered by such paragraphs, it is more accurately and specifically described as unfinished blades for safety razors in paragraph 358.

It is not contended by anyone that the merchandise is not unfinished blades, but the importers insist that it is not unfinished blades for safety razors. The fact that the blades, in their imported condition, are not separated from each other and are in a long strip is not urged as a reason for their not in fact being blades. See *United States* v. *Buss & Co.*, 5 Ct. Cust. Appls. 110.

If the goods in fact are unfinished blades for safety razors, it is conceded that they should be classified under that paragraph. So, the first question before this court is, Is the merchandise blades for safety razors in an unfinished state? If it is, then it is immaterial whether they are or are not described in any other paragraph claimed.

It was shown by importers, in the testimony of the case, that the imported merchandise was used to some extent, though probably slight, for making blades for a desk knife which is known as the Zee cutter, and also for paint scrapers or removers. The testimony shows that the only difference between the blade used for the Zee desk cutter and that of the safety razor is in the degree of honing, since a razor edge or razor sharpness is not required or desired for desk purposes.

No witness testified what per centum of the importation was used for making blades other than those used as blades for safety razors. From the admissions of counsel in their briefs, and from the meager testimony in the case on this point, it must be concluded that the use of the blades other than as razor blades is not a large one and is very small in comparison to the great amount of them which are used for razor purposes.

An examination of the Zee cutter discloses that what appears to be an ordinary safety razor blade of Gillette type, containing the three holes of the same character as characterizes the importation and as characterizes Gillette razor blades, with two edges, is inserted between two thin strips of metal each of which contains holes corresponding in position with the holes in the blade. The holes in the metal strips forming the handle are all round and the edges of same protrude and fit into the holes in the blade. The oblong shape of the two holes of the blade serves no purpose when used with the Zee cutter. Only one edge of the razor blade is permitted to be exposed. No sample of the window scraper was introduced in evidence.

Illustrative Exhibit G is a kind of safety razor in which are used the blades in question and which razor contains but two posts—round in shape, which posts are made to receive the two end holes only of the blade, the third hole of the blade having no post to corre-

spond. In this exhibit the two posts are round and do not match or fit the two oblong holes in the blade.

In the opinion, delivered by Associate Justice Fischer, for the Second Division of the United States Customs Court, in this case, it was held that—

The identity of the unfinished razor blades is established with absolute certainty, and such identity is not destroyed by some exceptional or fugitive use that may be made of the article.

The decision of the trial court is based on the doctrine of chief use, and *Richardson Co.* v. *United States*, 8 Ct. Cust. Appls. 179, *Decorated Metal Manufacturing Co. (Inc.)* v. *United States*, 12 Ct. Cust. Appls. 140, *Artistic Weaving Co.* v. *Maguire et al.*, 13 Ct. Cust. Appls. 140, and *United States* v. *Buss & Co.*, 5 Ct. Cust. Appls. 110, are relied upon as controlling.

No reference was made in the decision below to the following cases, to which importers now call our attention and urge that they are controlling in the issues at bar: *United States* v. *National Importing Co. (Inc.) et al.*, 12 Ct. Cust. Appls. 186, involving the classification, as unfinished smokers' articles, of pressed amber resembling pipe bits and cigarette holders; *United States* v. *American Bead Co. et al.*, 9 Ct. Cust. Appls. 27, which concerned snaps, clasps, and swivels as being dutiable as parts of chains; *Snow's United States Sample Express Co.* v. *United States*, 8 Ct. Cust. Appls. 17, which concerned cotton cloth printed with designs of bedspreads, with marks for cutting into pieces; *Rogers* v. *United States*, 14 Ct. Cust. Appls. 51, T. D. 41552, pertaining to wool chair backs in the piece.

Importers contend that these cases establish the doctrine that where an article is used to make more than one thing and is not wholly dedicated to making a certain single article, it can not be that article in an unfinished state.

In the *National Importing Co.* case, *supra*, certain pieces of pressed amber resembling pipe bits and cigarette holders, which were not bored or shaped in their final form, were shown to have been sold and used for the purpose of making smokers' articles, and also sold to and used by jewelers in making pendants and drops in the manufacture of jewelry. It was there held, following the decision in the case of *United States* v. *American Bead Co.*, 9 Ct. Cust. Appls. 27, that they were not unfinished smokers' articles, and the following language was used:

The authorities seem to be unanimous in their support of the proposition that in order to take the importation out of paragraph 11 as amberoid, unmanufactured, it *must be found that they were manufactured to such extent that they were committed or dedicated to a use as smokers' articles alone, and that if they had not been so manufactured when imported, and were in such form that they could readily*

be used for other purposes and were so used, they should be classified as amberoid, unmanufactured.—United States v. Lyon & Healy (4 Ct. Cust. Appls. 438; T. D. 33873), Wyman v. United States (T. D. 28924), Athenia Steel & Wire Co. v. United States (1 Ct. Cust. Appls. 494; T. D. 31528), Worthington v. Robbins (139 U. S. 337). (Italics ours.)

In the *American Bead Co.* case, *supra*, the following language was used:

An article not an actual constituent of a manufacture can not be considered as part thereof unless it has been advanced to a point which *definitely commits it to that specific class and kind of manufacture.* An article commercially suitable and commercially used for the making of different things is a material which is just as much adapted to the production of all of them as it is to the production of any one of them, and *until it has been finally appropriated to some definite manufacturing use* and has been given the distinguishing characteristics which clearly identify it as one of the components ultimately to be assembled into a particular completed whole, it can not be regarded as a part of any specified manufacture.

Inasmuch as the snaps, clasps, and swivels under discussion are just as applicable to the manufacture of bead necklaces as they are to making of chains, it is evident that they are not finally committed to the manufacture of chains, and consequently it can not be said that they are "parts of chains." (Italics ours.)

In *Snow's United States Sample Express Co.* case, *supra*, the merchandise consisted of cotton cloth printed with the designs of bedspreads, having a length of about 30 yards and a width of 70 to 80 inches. It was generally used for making bedspreads, but was to a slight extent used for making curtains and portières. The court held that it was not an unfinished article made of cotton cloth, and used the following language:

* * * To become a finished or unfinished article or a manufacture made from cotton cloth or from cotton cloth printed, within the meaning of paragraphs 253 and 266, the cloth, whether in the piece or not, must have been so dealt with by manufacturing processes that it has acquired either special characteristics which do not properly belong to cotton cloth or cotton cloth printed or a form and individuality which identify the product of such processes as a definite, particular article so far advanced that it is committed to a specific use and is no longer available for the general purposes for which the unprocessed cotton cloth or cotton cloth printed was suitable. * * *

The court, in discussing other cases, said:

* * * We note, however, that every one of those cases involved merchandise the manufacture of which had proceeded so far that it either became something more than woven fabrics in the piece or its identity was established as a particular article, and therein lies the difference between those cases and this case. There the merchandise in every case was committed to a specific use and was so far advanced that it had an individuality which identified it in its unfinished state as the thing it would be when finished. Here, however, the cotton fabric is still cotton cloth printed and so printed that it is no more committed to the making of bedspreads than it is to the making of curtains or portières or table spreads or couch covers. * * *

In the *Rogers* case, *supra*, which involved woven upholstery fabrics imported in running lengths of from 30 to 50 meters, having large

figures so woven in the cloth as to make it adaptable by cutting between the figures, for chair, sofa, and davenport backs and seats, the court said:

When used on a davenport, at least three figures are required. It is at once apparent that the imported merchandise has not been so processed as to commit it to a single use. It may be used for at least three separate and distinct uses. * * * The importation does not consist of chair backs or seats, but is a material designed to be used for covering the backs and seats of furniture.

It was, therefore, held that the goods were not manufactures in chief value of wool, but were woven fabrics of wool.

While some of the cases cited in the opinion below might have some bearing on the issues involved here, we think the expressions of this court in the four cases last cited here have established the rule in this kind of case to be substantially that as was laid down in the *United States* v. *American Bead Co.* case, *supra;* that is to say, "An article commercially suitable and commercially used for the making of different things is a material which is just as much adapted to the production of all of them as it is to the production of any one of them, and until it has been finally appropriated to some definite manufacturing use and has been given the distinguishing characteristics which clearly identify it as one of the components ultimately to be assembled into a particular completed whole, it can not be regarded as a part of any specified manufacture." While this rule was applied in defining "parts," it also applies to determining the application of the word "unfinished." *United States* v. *National Importing Co., supra.*

The question in the case at bar, therefore, is, Was the importation in the condition imported, definitely committed to a specific class or kind of manufacture? Adopting the reasoning used in the *Rogers* case, *supra,* is the identity of the individual article fixed or certain, or applying the doctrine of the *National Importing Co.* case, *supra,* was the merchandise committed or dedicated to the use as blades for safety razors alone?

An examination of the sample before us, and a fair consideration of the testimony in the case, has brought us to the irresistible conclusion that these strips of steel, made as they are to possess the shape, size, and all of the necessary characteristics of unfinished blades for safety razors, are in fact unfinished safety-razor blades, notwithstanding the fact that as unfinished safety-razor blades they are used for other purposes. The fact that unfinished safety-razor blades may be used, as we think they are used, for window scrapers, or desk knives, does not make them any less unfinished safety-razor blades. We think they had been dedicated to a single use before reaching this country. The width, thickness, temper, polish, and especially

the particular kind of perforations, all dedicated them to the single use as safety-razor blades. True enough, the tempering and polishing might fit the steel for the manufacture of pen points, but all of these efforts worked to the same end until, finally, the holes were cut, with such exactitude as to make the three holes in their exact form and position necessary only for fitting the posts of safety razors. To our minds it makes no difference when the perforations were made, if made before importation. This we regard as a dedication to a single purpose regardless of what the article might have been used for, or may be used for after having been so dedicated. A horse blanket with its straps and buckles is no less a horse blanket because it may be used as a covering for human beings.

In *Durbrow & Hearne Mfg. Co.* v. *United States*, 9 Ct. Cust. Appls. 177, steel shuttles were held to be parts of sewing machines, notwithstanding the fact that they were chiefly used in this country in embroidery machines.

The case of *Redden & Martin* v. *United States*, 5 Ct. Cust. Appls. 485, cited at length and relied upon in the opinion of the court below, seems also to be in point with the issues at hand. There the appraiser described the articles as "unpunched, unfinished scissors, sometimes called scissors forgings, intended to be ground down, punched, and manufactured into finished scissors." They were claimed by importers to be forgings of iron or steel. The importation was held by this court to be unfinished scissors blades, and the following language was used:

> The decisive factor in the present case is found in the circumstance that the articles in question were brought to their present condition as part of the process of manufacturing them into finished scissors blades, and that this process has so far advanced in their case that the articles possess the elementary form and substance of scissors blades and are unsuitable commercially for any other use. * * * There must therefore come a point in the manufacturing process where in the contemplation of the act the articles become scissors or scissors blades in name and character, even though they may not yet be finished and ready for use as such. In the manufacture of the present articles that point has been reached. The numerous and important processes of manufacture through which they must yet pass are essentially finishing processes, such as do not forbid their present classification as unfinished scissors blades.

Since the provision for unfinished blades of safety razors is more specific than any of the provisions claimed by importers, and since the above reasoning requires that the goods be classified under paragraph 358, it is not necessary for us to determine whether the merchandise is or is not of the character described in the paragraphs as claimed by importers.

The judgment of the United States Customs Court is *affirmed*.