**EMPIRE FINDINGS CO., Inc.**

v.

**UNITED STATES.**

C.D. 2830.   Protest 61/7304–17491–60.

United States Customs Court,
First Division.

Nov. 25, 1966.

Siegel, Mandell & Davidson, New York City (Murray Sklaroff, David Serko, and Allan H. Kamnitz, New York City, of counsel) for plaintiff.

Barefoot Sanders, Asst. Atty. Gen. (Harold L. Grossman, New York City, trial attorney), for defendant.

Before OLIVER, NICHOLS, and WATSON, Judges.

NICHOLS, Judge:

The merchandise in the case at bar consists of glass articles, which the collector classified as "finished glass clinical thermometers" (entries 505800, 968832, and 479506) and "unfinished glass clinical thermometers" (entry 959777), and on all of which he assessed duty at 85 percent ad valorem under paragraph 218(a), Tariff Act of 1930, as modified by Presidential Proclamation No. 3235, T.D. 54577. The single protest applying to all four entries claims under paragraph 218, as modified, at 42½ or 32½ percent. Plaintiff admits that the articles, finished, are dutiable under paragraph 218(a). It claims that the unfinished articles in entry 959777, described in the invoice as "shaped glass capillary tubing," are properly dutiable as glass tubes, rods, canes, and tubing under paragraph 218(b) at 32½ percent, but its principal claim for all entries is under paragraph 218(a), at 42½ percent. It claims under the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739 and T.D. 52820, reducing the statutory rate to that figure and says that Presidential Proclamation No. 3235, T.D. 54577, was void and ineffective to do what it purported to do, restore the full statutory rate for "clinical thermometers, finished or unfinished, wholly or in chief value of glass."

Our decision falls into two parts, because we must dispose of preliminary

issues before considering the validity of the Presidential proclamation.

*First: The proper classification of the unfinished articles.* The pertinent tariff provisions are as follows:

Paragraph 218(a) of the Tariff Act of 1930:

Biological, chemical, metallurgical, pharmaceutical, and surgical articles and utensils of all kinds, including all scientific articles, and utensils, whether used for experimental purposes in hospitals, laboratories, schools or universities, colleges, or otherwise, all the foregoing (except articles provided for in paragraph 217 or in subparagraph (e)), finished or unfinished, wholly or in chief value of glass, 85 per centum ad valorem; * * *.

Paragraph 218(a), as modified by T.D. 52739 and T.D. 52820:

Biological, chemical, metallurgical, pharmaceutical, and surgical articles and utensils of all kinds, including all scientific articles, and utensils, whether used for experimental purposes in hospitals, laboratories, schools or universities, colleges, or otherwise, all the foregoing (except articles provided for in paragraph 217 or 218(e), Tariff Act of 1930), finished or unfinished, wholly or in chief value of glass ..... 42½% ad val.

Presidential Proclamation No. 3235, T.D. 54577:

NOW, THEREFORE, I, DWIGHT D. EISENHOWER, President of the United States of America, acting under the authority vested in me by section 350 of the Tariff Act of 1930, as amended, and by section 7(c) of the Trade Agreements Extension Act of 1951, as amended, and in accordance with the provisions of Article XIX of the said General Agreement on Tariffs and Trade, do proclaim that, effective after the close of business on May 21, 1958, and until the President otherwise proclaims, the tariff concession granted in the said General Agreement with respect to clinical thermometers, finished or unfinished, wholly or in chief value of glass, provided for in said item 218(a), shall be withdrawn, and the said Proclamation No. 2929 of June 2, 1951, and the said notification of September 10, 1951, as amended by the said notification of September 20, 1951, shall be suspended insofar as they establish a rate of duty to be applied to the clinical thermometers provided for in the said item 218(a) on which the concession is withdrawn by this proclamation.

The record reflects that the production of glass clinical thermometers starts with blown or drawn glass tubing or "cane." This is filled with mercury and cut into lengths. The mercury is withdrawn and measured to classify the tube by bore size. A small blister is blown into the tube near one end and the end is pinched off. Bulb tubing is joined to the opening. A part of the imported merchandise, designated as No. 8 on the invoices, is in the state of advancement now attained. Subsequently the tube is filled with mercury. The mercury is drawn into the end opposite the bulb and the constriction is put in which keeps the mercury from falling back after removal from the patient's mouth until the instrument is read and shaken down. The constriction properly placed, the mercury is returned, by shaking, to the bulb. The part of the imported merchandise designated on the invoices as No. 11 is at the stage now attained. The next operations are for getting gas out of the tube. It is separated from the mercury and driven up to the head, by various methods. Next, the instrument is placed in 106° water to test if the column rises the proper distance from the top and from the bulb. The tube is then sealed and the top chamber removed. The result is known as a blank. The blanks are immersed in water at 98° and 106° Farenheit, and the column level marked with ink. The blank is tested for presence of air by driving the mercury column to the top. It is coated with wax and engraved with the temperature locations. Scratches through

the wax are made which are then marked with acid. It remains to dip in ink for the colored markings on the completed instrument.

There is no other known industrial use for the material after any of the measures described above have been taken. Plaintiff's witness admitted that both items 8 and 11 were specifically dedicated for use as glass clinical thermometers. Our description, based on the record, is highly oversimplified but is believed sufficient for decision herein. The record in the Tariff Commission proceeding, exhibit 8 herein, reflects the existence of 130 well recognized manufacturing steps in the production of a glass clinical thermometer. Exhibit 5 is a list of 28 steps advancing the merchandise just from the state of invoice item 11 to a blank. In the form of item 8, plaintiff's witness said, 20 percent of the value of a clinical thermometer has been added, in item 11, 45 percent and in the blank 75 percent. A Government witness gives the first two as 40 to 45 percent and 65 percent.

Some producers perform all the steps from production of the blown tubing or "cane" to the finished product. Commonly, however, unfinished thermometers are sold and purchased in blank form. Between 1954 and 1957 nearly all imports were finished blanks, but since then there has grown up some trade in unfinished blanks. Steps in producing blanks are commonly subcontracted out.

The Government witnesses said that the exhibits like items 8 and 11 were unfinished clinical thermometers.

█ Considering the entire record, the plaintiff has not established that the unfinished imports are not unfinished clinical thermometers for tariff purposes. The parties have not cited authority construing the words "finished or unfinished" in paragraph 218(a) and we have found none, but reported cases construing the same language in other paragraphs are common; among others: Nyman & Schultz v. United States, 14 Ct.Cust.Appls. 432, T.D. 42060; Para-

mount Import Export Co. et al. v. United States, 45 CCPA 82, C.A.D. 677; United States v. F. B. Vandegrift & Co., Inc. 44 CCPA 15, C.A.D. 628; Snow's United States Sample Express Co. v. United States, 8 Ct.Cust.Appls. 17, T.D. 37161.

In the recent case of United States v. Fred Frankel & Sons, 52 CCPA 81, C.A.D. 862, our appellate court held, reversing this division, that strings of beads to be made into imitation pearl necklaces by "pearlizing" after importation were, as imported, "unfinished jewelry." It said it did not agree they had to be known commonly or commercially as jewelry to come under that provision (pp. 85–86):

> * * * Where the ultimate destiny as necklaces is clear, we do not see that it is of much importance just which part of the manufacturing process remains to be done so as to make the jewelry "unfinished."

In view of this authority, it does not seem that plaintiff would meet its burden even if it persuaded us that the merchandise is commonly or commercially known as "shaped glass capillary tubings," but we cannot find, in light of conflicting testimony, that it is so called.

The Government relies particularly on Redden & Martin v. United States, 5 Ct. Cust.Appls. 485, T.D. 35147, in which "unpunched, unfinished scissors, sometimes called scissors forgings, intended to be ground down, punched, and manufactured into finished scissors," were held to be "unfinished scissors blades." The court said that the articles possessed "the elementary form and substance of scissors blades and are unsuitable commercially for any other use." Page 487.

The samples, as "potent witnesses" tell us here that the so-called "shaped glass capillary tubings" look and are shaped like clinical thermometers and obviously have been advancd far beyond suitability for any other use. Hence, we hold that the involved unfinished articles are un-

finished glass clinical thermometers, as classified, in a tariff sense.

*Second: Whether Presidential Proclamation 3235 is void*

██ This requires adjudication of the issue or issues which plaintiff most stresses. It calls inadequate the published notice, 22 FR 3910, in which the Tariff Commission announced it had, on receipt of a complaint, instituted an investigation to determine whether, as a result of a Trade Agreement Concession (the Torquay protocol, supra), clinical thermometers, finished or unfinished, were being imported in such increased quantities as to cause or threaten serious injury to domestic industry. It gave the date and place of a public hearing and stated that the complainant's application was on file and could be consulted. Of course, this was a proceeding under the "escape clause," section 7 of the Trade Agreements Extension Act of 1951 (19 U.S.C. § 1364). Plaintiff says that the application did not cover unfinished thermometers less advanced than blanks, and, therefore, a fatal various exists between the notice and the document it incorporates by reference. It says that, if the notice is inadequate, the Presidential proclamation has no validity or effect.

However, the application itself, plaintiff's exhibit 7, in its opening sentence, declares it is an application "to determine whether clinical thermometers, finished or unfinished, dutiable under paragraph 218(a) of the Tariff Act of 1930," are being imported in such increased quantities as to cause or threaten injury to the domestic industry, the very same language used in the notice, and later on in the report to the President, plaintiff's exhibit 6, and in the Presidential proclamation, T.D. 54577, withdrawing the concession. Where is the variance?

██ According to the plaintiff, the duty of the Tariff Commission under section 7 was to make determinations and advise the President respecting "any product." It says it is obvious that, in the over one hundred "steps" anterior to the blank, there were "over one hundred different products." The complaint, exhibit 7, said the complainants were domestic manufacturers of finished thermometers and blanks. It says:

The product is the clinical thermometer, Eighty five percent of the thermometer itself, as an instrument, constitutes what is called the "Blank" or sealed tube. In its "blank" state, it represents an 85% finished thermometer. [Punctuation as in the original.]

There would seem to be perhaps some ambiguity in the complaint as to what the "product" is. The hearings reflected that most of the injury resulted from increased imports of blanks. There was nothing to show that imports of unfinished thermometers in forms less advanced than blanks were statistically more than negligible, still less that they inflicted injury, until after the date of the Presidential proclamation. However, the hearings and report developed that part of the domestic industry consisted of subcontractors performing operations before the blank state; presumably effective protection of these people would require that whatever tariff increase was recommended should apply to imports no further advanced than the steps such people performed. Thus, while the type of "unfinished" thermometer chiefly traded in consisted of thermometer blanks, there were articles traded in which were finished to a lesser degree. Logically, they were included in the investigation, and any that are "unfinished" thermometers in the tariff sense are included in the findings and recommendations.

The only reasonable interpretation of the complaint, the notice, the report, and the proclamation, is that the framers of all four documents intended to deal with clinical thermometers, finished or unfinished, as a single product. There is no variance in what they said they covered, and if the blanks received most of the attention, that was only natural. If there is a possibility here that the proclamation is void on account of the discrepancy plaintiff relies on, it can be

restated as resulting from a rule that in applying section 7, the Tariff Commission may not lump together as a single "product" variants as to degree of advancement some of which are imported to the injury of domestic industry, and some of which are not.

We may assume that under section 7, as under section 336, Tariff Act of 1930, the "Flexible Tariff," proper notice of hearing, stating what merchandise is effected, is essential if the Presidential action raising the rate is to be other than void. Carl Zeiss, Inc. v. United States, 23 CCPA 7, T.D. 47654. The notice, however, may without invalidity employ phraseology which is ambiguous or susceptible to more than one interpretation. Lord & Taylor v. United States, 26 CCPA 151, C.A.D. 9. The words "finished or unfinished" were included in several tariff paragraphs, including the one whose modification is under attack, 218(a). They had been in the past, and were in the future to be, the subject of judicial interpretation in reported cases, some cited, supra. There can be no doubt that the complainants would be taken to intend to adopt such judicial interpretations, those of the past, (United States v. E. Dillingham, Inc., 41 CCPA 221, 225, C.A.D. 555) and those of the future also (National Carloading Corporation v. United States, 53 CCPA ——, C.A.D. 877). The intent of the Tariff Commission, in giving notice and making its report, obviously was the same. Hence, notwithstanding some confusing phraseology about blanks, any person would be advised that the judicial criteria of "finished or unfinished" might govern, sufficiently "to excite attention and put the party on his guard and call for inquiry." Lord & Taylor, supra, at page 156. The Commission has been held empowered to make its own new definition of an "article" or "product," carving out the item it chooses to investigate from a previously undifferentiated tariff enumeration. Fox River Butter Co. v. United States, 20 CCPA 38, T.D. 45675. That is what it did here, taking "clinical thermome-

ters, finished or unfinished" out of "Biological, chemical, metallurgical, pharmaceutical, and surgical articles and utensils of all kinds * * * finished or unfinished, wholly or in chief value of glass." The plaintiff does not cite any case the converse of Fox River Butter Co., saying they must cut out of their description of the "product" they are to investigate any subproduct however closely related, which is not in fact imported to the injury of domestic industry. It is plaintiff's arbitrary assumption that such a rule exists which makes it unable to see consistency in the complaint, notice, report, and proclamation herein.

This court would have to be the adoptive parent of such a rule, as assuredly it could not be fathered on the Congress. It would mean, presumably, that in 1957 the Tariff Commission would have had to exclude from its investigation unfinished clinical thermometers less advanced then blanks, because they were not then imported in injurious quantities. Then, the day after the effective date of the proclamation, parties might import items with the last manufacturing step before the blank omitted. There would have to be another complaint, another notice, another report, another proclamation. Then might come in imports with the two last steps omitted. And so on through 28 proceedings, for 28 steps each generating, according to plaintiff, a different "product," just to have a valid proclamation covering the item 11 imported herein. Evidently, long before the domestic clinical thermometer industry obtained tariff protection, such as the Congress intended, the glass clinical thermometer itself would be a museum piece and doctors would be obtaining patient's temperatures—if they still thought the information useful—by some method not even guessed at now.

While not on all fours, United States (American Sponge & Chamois Co., Inc., Party in Interest) v. Nylonge Corporation, 48 CCPA 55, C.A.D. 764, offers an interesting parallel to the case at bar.

It was an American manufacturer's protest under section 516(b), Tariff Act of 1930. The party in interest alleged a variance between the statutory complaint to the Secretary and the protest, in that the former described merchandise more advanced than that actually entered and subject to the protest. It said the Commissioner of Customs, to whom the Secretary's authority was delegated never had an opportunity to pass on the American manufacturer's claim with respect to the merchandise. The court answered at pages 59–60:

> As to the nature of the complaint to the Secretary, here also it appears to us that the complainant has complied fully with the requirements of the statute. That the complaint merely includes certain processes which are not necessary to the actual production of the cellulose sponge material and to which the imports had not been subjected before importation is not persuasive that the imported merchandise is different from that designated in the complaint. There is no question but that the imported merchandise was adequately identified and is *basically* the same as that of the complaint. Moreover, there is no evidence that the Secretary of the Treasury made a decision on goods of a different description than that of the imported goods. [Emphasis quoted.]

■ Presidential proclamations fixing tariff rates, like tariff statutes, are manifestly intended for the future. Thus the rubber footwear proclamation, T.D. 46158 of 1933, covers certain footwear of india rubber or "substitutes for rubber" though such substitutes as modern synthetics and plastics were not known in 1933 or for many years to come, and of course the then nonexistent producers of such plastics and synthetics were given no hearing. Whether T.D. 46158, as framed was authorized may be considered now moot in view of subsequent ratification by the Congress, see A. Zerkowitz & Co., Inc. v. United States, 55 Cust.Ct. 643, Reap.Dec 11095

(application for review pending); it is only mentioned here to illustrate the kind of provision for the future that might be anticipated in "flexible tariff" administration. Cf. H. H. MacDonaugh & Co. et al. v. United States, 38 CCPA 36, C.A.D. 436, holding that domestic merchandise protected by American selling price valuation instituted under T.D. 46158, may include merchandise not produced when the investigation was conducted.

■ We hold that, in considering modification of a tariff paragraph under "Peril Point" procedure, the Tariff Commission may frame its definition of a "product" within a single tariff item, as enacted, by extending it to the "product," finished or unfinished, when the tariff item applies to such articles finished or unfinished, as enacted, even though this language may apply to unfinished forms of the "product" not imported at all at the time of notice and hearing, and *a fortiori*, of course, not imported in such quantities as to cause injury to domestic industry. We further hold there is no inconsistency between the complaint, notice, report, and proclamation, when all four state that the subject dealt with is clinical thermometers, finished or unfinished.

In giving consideration to plaintiff's contentions, we have assumed that plaintiff is in a position to assert them, but this is far from certain. The record reflects that Propper Manufacturing Co., parent of Empire Findings Co., took part in the Tariff Commission hearings. Our appellate court has held that actual participation in an agency proceeding waives a defective notice, even when it is claimed that "the procedural irregularity resulted in the loss of agency jurisdiction so that the order is totally void." United States v. Elof Hansson, Inc., 296 F.2d 779, 48 CCPA 91, 95.

For the reasons stated, the protest is overruled and judgment will be rendered for the defendant.

OLIVER and WATSON, JJ., concur.