TERUMO-AMERICA, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Before RE, *Chief Judge*.

Court No. 78-5-00812

(Decided September 30, 1981)

*Glad, Tuttle & White* (*Robert Glenn White* at the trial and on the briefs), for the plaintiff.

*J. Paul McGrath*, Assistant Attorney General; *Joseph I. Liebman*, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch (*John J. Mahon* at the trial and on the brief; *Melvin E. Lazar*, International Trade Litigation, United States Customs Service, of counsel, at the trial and on the brief), for the defendant.

RE, *Chief Judge:* The question presented in this case pertains to the proper classification of certain merchandise described on the customs invoice as "glass rods (stems)" used in the manufacture of clinical thermometers. It must be noted at the outset that the merchandise, the classification of which is in issue, consists of glass rods or stems in lengths of approximately 120 centimeters, or 48 inches long, which may vary from 3 to 4 inches in length. These rods are exemplified by plaintiff's collective exhibit 1. They are the only

merchandise in issue and are not to be confused with plaintiff's collective exhibit 2, which consists of approximately 5-inch pieces that have been cut from the rods after importation.

The imported glass rods were classified by the customs officials as clinical thermometers under item 711.34 of the Tariff Schedules of the United States (TSUS), as modified by T.D. 68–9, and assessed with duty at the rate of 42.5 percent ad valorem.

Plaintiff, a manufacturer of medical products, contests the classification and, consequently, the rate of duty assessed. It claims that the merchandise is properly classifiable as other glass rods or tubes, not processed, not containing over 95 percent silica by weight, under item 540.43, TSUS, as modified by T.D. 68–9, with a rate of duty of only 16 per centum ad valorem. If not classifiable under item 540.43, TSUS, plaintiff claims in the alternative that the merchandise should be classified as tubes and tubing with ends processed, not containing over 95 percent silica by weight, under item 548.03, TSUS, as modified, dutiable at 16 per centum ad valorem; or as articles of glass not specially provided for, other than tubes with ends processed, under item 548.05, TSUS, as modified, and dutiable at 12.5 per centum ad valorem.

Originally, plaintiff also claimed classification under item 540.41 or item 548.01, TSUS, as modified, but those claims were abandoned.

The defendant maintains that the glass rods have been properly classified. However, if it is determined that they are not unfinished thermometers, the defendant contends that they should be classified, alternatively, as other tubes and tubing with ends processed under item 548.03 of the tariff schedules, with duty at 16 per centum ad valorem. This is apparently the first case in which the issue arises under the Tariff Schedules of the United States, rather than under the older tariff acts.

The competing provisions of the tariff schedules read as follows:

[Classified]

"Hydrometers and similar floating instruments * * *:
    Thermometers * * *:
        Non-recording instruments:
           Thermometers:
              Liquid-filled thermometers with the graduations on the tube or on a scale enclosed within an outer shell:

711.34                      Clinical_____ 42.5% ad val."

[Plaintiff's primary claim]

"Glass rods, tubes, and tubing, all the foregoing not processed:

\* \* \* Containing over 95 percent silica by weight_____ \* \* \*

540.43    Other_____    16% ad val."

[Plaintiff's and defendant's alternative claim]

"Articles not specially provided for, of glass:

Tubes and tubing with ends processed:

\* \* \* Containing over 95 percent silica by weight_____ \* \* \*

548.03    Other_____    16% ad val."

[Plaintiff's alternative claim]

548.05    Other_____    12.5% ad val.

*General Headnotes and Rules of Interpretation, TSUS:*

"10. *General Interpretative Rules.* For the purposes of these schedules—

\*        \*        \*        \*        \*        \*        \*

(h) unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and *whether finished, or unfinished;*" (Emphasis added.)

It has been established that the merchandise: (1) is in chief value of glass; (2) does not contain over 95 percent silica by weight; (3) is in lengths of approximately 120 centimeters, or 48 inches long; and (4) is used and dedicated to the making of thermometers.

Plaintiff maintains that in customs law, "material" although dedicated to a single use is not to be classified as an unfinished *eo nomine* article unless it has been so advanced as to have attained an individuality which identifies it as one of the named articles. *Bendix Mouldings, Inc.* v. *United States*, 73 Cust. Ct. 204, 205, C.D. 4576, 388 F. Supp. 1193 (1974), *appeal dismissed*, 62 CCPA 109 (1975). See also *Pacific Fast Mail, Inc.* v. *United States*, 63 Cust. Ct. 468, C.D. 3938 (1969). In essence, plaintiff contends that the imported 48-inch-long tubes are not unfinished thermometers, but merely "material" from which thermometers are made by cutting, and by many additional manufacturing processes. In support of its contention, plaintiff states that the importations are not sufficiently advanced for the following reasons:

(a) as imported, the number of clinical thermometers that can be made from the given shipment cannot be identified,

(b) extensive and costly further processing is necessary to make the glass rods in issue into finished clinical thermometers,

(c) the configuration and capillary size of the articles do not preclude classification as glass rods or tubes, and

(d) heat sealing of the ends is not a processing that advances the articles toward their ultimate use.

Plaintiff submits that the imported glass rods have not attained an individuality as unfinished clinical thermometers; that the imported glass articles are rods and tubes; and that the ends of the glass rods are not "processed" as this term is used in the tariff schedules. The defendant submits that the imported merchandise has attained an individuality which identifies it as unfinished thermometers.

In the *Bendix Mouldings* case, cited by both parties, the merchandise consisted of wood moldings whose surface had been treated in various ways. The moldings were generally imported in 9-foot lengths, and possessed a recessed groove, known as a rabbet, cut into the rear inner edge of the molding. The rabbet was designed to hold a picture or mirror within the frames. After importation, the articles were cut and joined to form picture or mirror frames. As imported, however, the moldings gave no indication of the individual identity or size and shape of any particular frame. Hence, it was held that the imported moldings were not unfinished frames, and were properly classified as other wood moldings under TSUS item 202.66, rather than as picture and mirror frames under TSUS item 206.60. After studying past case law, Judge Watson concluded that certain useful guidelines had emerged as to when a "material" became an "article":

"With respect to importations which are in a form dedicated to a certain use but from which the claimed individual articles have not yet fully emerged, to my mind the underlying question is whether the identity of an actual individual article can somehow be discerned." 73 Cust. Ct. at 205.

The court also cited a number of early relevant cases. For example, in *In Re Mills*, 56 F. 820 (S.D.N.Y. 1893), certain lengths of fabric were held to be improperly classified as partly made wearing apparel and were held dutiable as manufactures of cotton. The court stated that " * * * it must at least be made up sufficiently far to enable us to identify the particular article of wearing apparel that is going to be made out ot it." *Id.* at 821.

The "rule of decision" for these cases was articulated in *United States* v. *Buss & Co.*, 5 Ct. Cust. Appls. 110, 113, T.D. 34138 (1914):

"[M]ost small articles are not produced as individual or separate products of the loom, but for economy of manufacture are first woven 'in the piece.' The rule of decision is therefore established that where such articles are *imported in the piece and nothing remains to be done except to cut them apart* they shall be treated for dutiable purposes as if already cut apart and assessed according to their individual character or identity. This follows, however,

*only in case the character or identity of the individual articles is fixed with certainty* and in case the woven piece in its entirety is not commercially capable of any other use." (Emphasis added.)

Under the *Buss* case, therefore, the test to be applied to articles "imported in the piece" is whether "nothing remains to be done except to cut them apart," and if "the character or identity of the individual articles is fixed with certainty." In the case at bar, surely much more remained to be done than merely to cut apart the imported 48-inch-long glass rods before the "identity of the individual [pieces] is fixed with certainty" as unfinished thermometers.

In *Pacific Fast Mail, Inc.* v. *United States*, 63 Cust. Ct. 468, C.D. 3938 (1969), wherein certain "rail" was found not to meet the criteria necessary to be an unfinished article, this court stated:

"We * * * find that the rail is not unfinished track. The fact that the former is dedicated to use in the construction of track is a helpful, but not the sole, criterion for determining whether it is that article in its unfinished state. *American Import Co.* v. *United States*, 26 CCPA 72, T.D. 49612 (1938); *The Harding Co. et al.* v. *United States*, 23 CCPA 250, T.D. 48109 (1936); *United States* v. *The Harding Co.*, 21 CCPA 307, T.D. 46830 (1933). Does the rail possess the shape, size, and all of the necessary characteristics of unfinished track, *Nyman & Shultz* v. *United States*, 14 Ct. Cust. Appls. 432, 437, T.D. 42060 (1927); is it so far advanced that it has an individuality which identifies it in its unfinished state as the thing it would be when finished, *Snow's United States Sample Express Co.* v. *United States*, 8 Ct. Cust. Appls. 17, 21, T.D. 37161, (1917); does it have even the 'elementary form and substance' of track so that *it has reached the point in the manufacturing process where it has become that article in 'name and character'*, *Redden & Martin* v. *United States*, 5 Ct. Cust. Appls. 485, 487, T.D. 35147 (1915)?

The importation meets none of the foregoing criteria: the sample rail in evidence is mute but potent witness to the fact that it possesses neither the shape, size, nor other characteristics which would identify it as track; and *the lengthy, detailed steps involved in constructing track from rail cogently illustrate that the latter has not reached the point where it may be considered track in the unfinished state.*

The rail stands in marked contrast to those commodities which this court and our court of appeals have held * * * to be 'unfinished' articles by reason of their being so far advanced toward their final form and shape that their ultimate purpose and use were self-evident." 63 Cust. Ct. at 472–473. (Emphasis added.)

In the present case, it is clear that the imported 48-inch-long glass rods had not "reached the point in the manufacturing process" that they had become "in name and character" clinical thermometers. They had not attained an individuality which identified them as unfinished thermometers, but were the "material" used in the manufacture of clinical thermometers.

The defendant stresses that the imported merchandise is dedicated to use as clinical thermometers and is incapable of being made into anything else. This, however, does not necessarily establish that the imported "material" is to be classified as an *eo nomine* article. It is well established that the mere fact that imported merchandise is dedicated to use in making particular articles or parts does not take the merchandise out of the class of "material." *Bendix*, 73 Cust. Ct. at 205. See also *The Harding Co.* v. *United States*, 23 CCPA 250, T.D. 48109 (1936) (automobile brake lining); *American Import Co.* v. *United States*, 26 CCPA 72, T.D. 49612 (1938) (fishing leader gut); *Overton & Co.* v. *United States*, 85 Cust. Ct. 76, C.D. 4875 (1980) ("Jordan bars").

At trial, plaintiff called Mr. Kum Tanaka, its administrative manager. Defendant's witnesses were Mr. Jonathan Tobelmann, marketing manager for tubing products, Corning Glass Works, and Mr. William Pymm, vice president of Pymm Thermometer Corp., a manufacturer of clinical thermometers.

In addition to plaintiff's collective exhibit 1, illustrative of the merchandise in issue, numerous exhibits (14 for plaintiff and 10 for defendant), were received in evidence. Among the exhibits carefully examined by the court were glass tubing, a variety of thermometers, and catalogue sheets pertinent to the manufacture of thermometers. The court also examined with care plaintiff's collective exhibit 2, consisting of the approximately 5-inch pieces of tubing that were cut from the glass rods after their importation. From the testimony of record, it is clear that although seven to nine pieces were usually cut from the 48-inch glass rods after their importation, it was not always possible to determine the exact number that could be cut from each rod, nor the type of thermometer for which the glass rods were best suited.

As imported, the 48-inch glass rods, which were shaped in the form of a prism, contained three sides. One side, which had a white back, was longer than the other two which sometimes were equal in length. The ends were sealed in the process of being cut in order to keep out dust and moisture. No scales or markings appeared on the outside of the glass rods at the time of importation.

Mr. Tanaka, who testified that he was aware that the physical characteristics of the imported glass rods differed from other tubing, described the major processes involved in manufacturing the imported merchandise into a finished thermometer. The glass rod is initially inspected for cleanliness and cracks, and is then cut into lengths. Although seven to nine pieces may be cut, Mr. Tanaka testified that "what is ultimately produced as a thermometer cannot be determined." In addition to a loss factor from waste and breakage, he added that

"[i]t cannot be readily defined, as far as how many thermometers can be made from any single stem * * * because there are many functions involved in the production of thermometers."

A bulb is then formed in the glass, and then cut in half to create a shoulder for its attachment. The bulb material is then fused onto the stem material. Mr. Tanaka described the function of the bulb in a finished thermometer as the end which will eventually be formed as a cavity for the mercury. He explained that there were different sizes of bulb glass because there were different types of thermometers, i.e., oral, rectal, ovulation and veterinary. The bulb determines the type of thermometer. There is a capillary within the glass that runs the length of the glass. The capillary, contained within the stem material, is the approximate diameter of one hair. When the diameter is constricted, one further reduces the one-hair diameter to approximately one-tenth of that size. The capillary will also determine the type of thermometer.

Mr. Tanaka explained that constriction is the heart of a clinical thermometer which is being designed to measure maximum temperature. When the temperature reaches 98.6 degrees, it remains there until forcibly shaken down. Plaintiff's exhibit 5, the witness said, is a glass tube that illustrates constriction. Mr. Tanaka also stated that the number of pieces cut from the imported glass rods could be affected by defects in the constriction which would make it impossible to manufacture a clinical thermometer.

After constriction, the thermometer is processed through an alcohol injection machine. The alcohol is poured into the bulb of the thermometer and measured electronically by computer to determine the amount of mercury that will be injected into the stem.

Terumo-America then determines the ultimate size into which the bulb will be cut. The process in forming the bulb or bubble consists of heat sealing the ends and using micrometer adjustments to determine exactly where the thermometer will be cut after it has been injected. The bubble piece is cut and the bubble end of the stem is sealed. Depending upon the thermometer, the bulb will either be inserted into the mouth or rectum. Mr. Tanaka examined collective exhibit 6, consisting of samples of oral and rectal thermometers, and identified the oral thermometer as the one with the longer bubble.

After the bubble is formed, the thermometer is aged in an oven for 24 hours by controlled heat and time adjustments. Terumo-America distills and purifies the mercury that it has purchased by a heat application. At this juncture, the mercury is injected through the open end capillary by vacuum. The end without the bulb is sealed. A calibration process is begun whereby the thermometer is required to have between 106 and 108 degrees of mercury to meet certain re-

quired standards of the States of Michigan, Connecticut, and Masssachusetts. Mr. Tanaka said there were no federally mandated standards.

Mr. Tanaka's testimony, which the court finds credible and reliable, fully supports plaintiff's contentions that the merchandise, as imported, was mere "material" dedicated to the making of thermometers. The testimony makes it clear that, even after being cut into 5-inch pieces, before becoming a finished thermometer the imported "glass rods (stems)" must undergo the following additional steps:

   (a) Reverse spinning centrifuge
   (b) Inspection of constriction
   (c) Cut off end by heat applications
   (d) Run through a conveyor to pull the mercury down
   (e) Heat application
   (f) Calibration
   (g) Printing
   (h) Placement in a baking conveyor to burn ink into the glass permanently
   (i) Acid washed
   (j) Set checkpoints
   (k) Final inspection

Mr. Tanaka concluded that, in view of the many additional necessary manufacturing processes, the merchandise, as imported, i.e., the 48-inch glass rods, had not reached a state of processing for it to be an "unfinished thermometer."

The defendant's first witness, Mr. Jonathan Tobelmann, was familiar with various stages in the production of clinical thermometers. He had visited most of the plants of clinical thermometer manufacturers in the United States, except Terumo-America, Inc., and one other small manufacturer. Upon being shown collective exhibit 1, illustrative of the merchandise in issue, Mr. Tobelmann said that he was familiar with the merchandise, and that Corning had manufactured tubing for the thermometer industry which was very similar to the imported merchandise. He also testified that his company is able to manufacture tubing of the same dimensions, and identified defendant's collective exhibit A as sticks of tubing that Corning sells to clinical thermometer manufacturers in the United States. Its tubing is 37, 45, 52 inches, or a little longer, and can be produced with different diameters and ends sealed or unsealed. Sealing is done to protect the bore from dirt or moisture.

Mr. Tobelmann described plaintiff's collective exhibit 1 as a stick of thermometer tubing, which is the first step in making a clinical thermometer. The witness described how Corning's thermometer is manufactured:

> In manufacturing our own thermometer, in the tubing that I had seen, it is a one-step process. It's a completely automated

process where the raw material goes into one end and the finished thermometer tubing is drawn out the other end and is cut to lengths and fire-polished or unfire-polished and then packaged. There are no subsequent steps of putting it all together.

Mr. Tobelmann testified that there were other methods, i.e., the hand method, as well as the semiautomated vertical method, which are still in use in some places in the world.

Defendant's second witness, Mr. William Pymm, in addition to being vice president of Pymm Thermometer Corp., was also associated with Pak Glass Machinery Corp., a manufacturer of specialized equipment for the clinical and industrial thermometer industry. He examined both plaintiff's collective exhibit 1 and defendant's collective exhibit A, which were pieces of Corning glass tubing, and testified that these exhibits looked identical except as to dimensions, the outside dimensions of plaintiff's collective exhibit 1 being thicker. Both exhibits have a prismatic shape, a white enamel backing, a bore, clear glass lens which magnifies the bore, and a sealed end. Mr. Pymm explained that the sealed end signifies that the ends were fire sealed with a flame which prevents dirt or moisture from entering the bore and protects the glass inside.

Although the tariff schedules do not define either a finished or an unfinished thermometer, both of which are subject to classification under item 711.34 in accordance with General Interpretative Rule 10(h), the *Summaries of Trade and Tariff Information* state the following in Schedule 7, vol. 2 at 181–182 (1970):

> "A typical finished clinical therommeter consists of a glass capillary tube approximately 4 inches long to which is attached a small glass bulb. The opening of the bulb connects with one end of the bore of the tube; the other end of the bore is sealed. Mercury is sealed in the bulb and part of the tube. Magnification properties of the tube, resulting from the prismatic construction of its walls, enables the column of mercury to be read in conjunction with an engraved scale on the tube's surface. An enamel strip, usually white, is embedded in the glass to serve as a contrasting background for the mercury column. Thermometers used in the United States are usually calibrated in degrees and fifths of degrees, Fahrenheit, with a scale ranging from 96° to 106°. Clinical thermometers are made from several varieties of lens clinical tubing.
>
> In use, the bulb end of the thermometer is inserted into a body cavity where heat from the body causes the mercury column to rise until the highest temperature to which the thermometer is exposed is reached. By means of a constriction in the bore of of the tube, the expanded column is prevented from contracting back toward the bulb. Before reuse, the thermometer must be reset by shaking the mercury to a point several degrees below normal body temperature.

Other types of clinical thermometers are those for veterinary use and basal thermometers. The former are used for measuring the temperature of large animals; the latter for ovulation tests. These two types, however, account for an extremely small percentage of clinical thermometers sold in the United States."

Prior to the adoption of the tariff schedules, clinical thermometers were classified under paragraph 218(a) of the Tariff Act of 1930. That paragraph was pertinent to the decision of this court in *Empire Findings Co.* v. *United States*, 57 Cust. Ct. 412, C.D. 2830, 260 F. Supp. 884 (1966) wherein the court reviewed the process of manufacturing a finished thermometer as follows:

[T]he production of glass clinical thermometers starts with blown or drawn glass tubing or "cane." This is filled with mercury and cut into lengths. The mercury is withdrawn and measured to classify the tube by bore size. A small blister is blown into the tube near one end and the end is pinched off. Bulb tubing is joined to the opening. *A part of the imported merchandise * * * is in the state of advancement now attained.* Subsequently the tube is filled with mercury. The mercury is drawn into the end opposite the bulb and the constriction is put in which keeps the mercury from falling back after removal from the patient's mouth until the instrument is read and shaken down. The constriction properly placed, the mercury is returned by shaking, to the bulb. * * * The next operations are for getting gas out of the tube. It is separated from the mercury and driven up to the head, by various methods. Next, the instrument is placed in 106° water to test if the column rises the proper distance from the top and from the bulb. The tube is then sealed and the top chamber removed. *The result is known as a blank.* The blanks are immersed in water at 98° and 106° Fahrenheit, and the column level marked with ink. The blank is tested for presence of air by driving the mercury column to the top. It is coated with wax and engraved with the temperature locations. Scratches through the wax are made which are then marked with acid. It remains to dip in ink for the colored markings on the completed instrument. 57 Cust. Ct. at 415. (Emphasis added.)

In *Empire* the issue was whether certain merchandise was unfinished glass clinical thermometers under paragraph 218(a) of the Tariff Act of 1930, as classified, or glass tubes, rods, canes, and tubing under paragraph 218(b) of that act, as alternatively claimed. In holding the imported merchandise to be unfinished glass clinical thermometers, as classified, the court stated that "[t]he samples, as 'potent witnesses' tell us here that the so-called 'shaped glass capillary tubings' look and are shaped like clinical thermometers and obviously have been *advanced far beyond suitability for any other use." Id.* at 417. (Emphasis added.)

In the present case, at the time of importation the merchandise consisted of 48-inch-long glass rods, represented by plaintiff's collective

exhibit 1, and not 6- or 7-inch glass tubes as in *Empire*. Unlike the present case, the merchandise in *Empire*, in addition to having been cut prior to importation, had been "advanced far beyond suitability for any other use." The glass rods here were "material" which required further processing to attain the individuality of the glass tubes in *Empire*, and, as imported, surely were not thermometer "blanks."

According to the United States Tariff Commission's *Report to the President on Investigation No. TEA–1A–1 Under Section 351(d)(2)(5) of the Trade Expansion Act of 1962* (T.C. Publication 90, May 1963, at 10), the manufacture of clinical thermometers has two distinct phases:

> "The first, the manufacture of the thermometer blank, comprises more than 100 operations; the second consists of 25 or more finishing operations involved in making the temperature scale (determined separately for each thermometer because of slight variations in the dimension of the bore of the tubing), engraving, pigmenting, and testing. Until recently, clinical thermometers were manufactured almost entirely by hand. During the last several years, however, a number of the larger producers have, at substantial expense, successfully mechanized certain of these manual operations."

Unfinished thermometers are also discussed in the *Report, supra* at 11, n.2:

> "Unfinished thermometers are known in the trade as blanks. A complete thermometer blank is a blank that has been processed up to but not including calibration, engraving, pigmentation, and testing. An incomplete thermometer blank is a blank that must be further processed before it can be calibrated, engraved, and so forth."

Plaintiff's witness, as well as defendant's witness, Mr. Pymm, testified in detail as to the time, effort, and cost required to process the imported merchandise into thermometers. Although dedicated to the use of making thermometers, much more remained to be done than merely to cut the imported rods and to identify them as unfinished thermometers. Furthermore, although the merchandise may be "part" of a clinical thermometer, it cannot be classified under item 711.34 since that item does not encompass "parts" of clinical thermometers. As mere "material," though dedicated to use as a clinical thermometer, the merchandise, as imported, was not sufficiently advanced or processed to be classified as an unfinished thermometer.

From the foregoing, and upon a careful examination of the imported merchandise as a "potent witness," the exhibits, and the testimony of the witnesses, the court has concluded that the imported merchandise is not an unfinished clinical thermometer. It is, therefore,

the determination of the court that it was improperly classified as clinical thermometers under item 711.34 of the tariff schedules.

Having determined that the assigned classification under item 711.34 of the tariff schedules is erroneous, the court will consider whether the imported merchandise falls within any of the alternate 'provisions claimed. Although classification has been urged under items 540.43 and 548.03, the parties have cited no cases directly in point as to whether the glass rods are tubes or tubing. The tariff schedules do not define tubes, and the *Tariff Classification Study, Explanatory and Background Materials* (1960) fails to shed light on this question. As previously noted, however, the *Summaries of Trade and Tariff Information* describe a clinical thermometer as consisting of "a glass capillary tube" and refers to tubes and tubing. Schedule 7, vol. 2 at 181–182 (1970). In addition, the record contains much supporting testimony which refers to the imported merchandise as "tubing." Mr. Tobelmann of Corning Glass Works not only stated that the imported merchandise was very similar to the "tubing" manufactured by Corning for the thermometer industry, but also that Corning sold clinical thermometer "tubing" to every United States manufacturer of clinical thermometers. There is no question, therefore, that the original material for a clinical thermometer starts with a "tube." From the testimony of record, and a visual examination of the exhibits, the court concludes, therefore, that the "imported glass rods (stems)" are glass tubes or tubing used in the manufacture of clinical thermometers.

Having determined the imported merchandise to be tubing, the court must also determine whether, for tariff purposes, the ends of the glass tubing have been processed. Plaintiff correctly indicates that neither the tariff schedules nor the *Tariff Classification Study, Explanatory and Background Materials*, Schedule 5 (1960), offers a clear statement of what is meant by the term "processed" in the prefatory headings to items 540.43 and 548.03. Although the ends of the glass were sealed, plaintiff alleges that the ends were not processed, as that term is used in the tariff schedules, since the processing in question must advance the glass rod or tube "to its final, intended use." Instead, plaintiff submits that the ends were sealed "for protection for transportation purposes only."

It is defendant's contention, however, the ends are processed since the flame sealing is done to keep the capillary bore clean to facilitate the insertion of mercury, a necessary element in the use and function of finished clinical thermometers. Mr. Tobelmann, who testified that his company, Corning Glass Works, seals its tubing to protect the bore from dirt or moisture, also testified that the word, "processing," when referring to glass tubing, means "the working of the glass after the tubing is made." In describing the cutting as part of

the process in order to make the glass tubing, he recalled the various processes used by Corning:

> In tubing, we take sand and lead, and many other components, and we process that glass, and/or material, and change it into some form, and in that same process, we put the white backing, and other things, and then we cut it. And it's considered to be the same process. And then we could seal it, and that could be another process.

Since plaintiff's witness, Mr. Tanaka, testified that the ends of Corning glass were similar to those of Terumo, and that Terumo's glass contained a white backing, it is reasonable to conclude that the imported merchandise must also have undergone a cutting and sealing process similar to Corning's glass tubing.

It is also relevant to note that the *Tariff Classification Study, supra* at 127, states that item 540.43 "cover[s] glass rods, tubes, and tubing which have not been processed, i.e., the articles have unsmoothed ends and are otherwise unworked."

From the foregoing, the court concludes that the flame sealing of ends of the glass rods or tubing was not merely "for protection for transportation purposes only," but also advanced the merchandise to its final, intended use as clinical thermometers. Consequently, for tariff purposes, the imported glass rods were glass "tubes and tubing with ends processed."

It is, therefore, the determination of the court that the imported merchandise was erroneously classified as clinical thermometers under TSUS item 711.34, and should be properly classified under TSUS item 548.03, as modified, as glass tubes and tubing with ends processed, not containing over 95 percent silica by weight, with duty at the rate of 16 percentum ad valorem.

Having determined the merchandise is properly classifiable under TSUS item 548.03, as modified, it is unnecessary for the court to consider plaintiff's alternative claim under TSUS item 548.05, as modified.

Judgment will be entered accordingly.