(C.D. 3888)

HEDAYA BROS. *v.* UNITED STATES

## United States Customs Court, Second Division

(Decided September 26, 1969)

*Sharretts, Paley, Carter & Blauvelt* (*Gail T. Cumins and Robert L. Follick* of counsel) for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Arthur H. Steinberg* and *Andrew P. Vance*, trial attorneys), for the defendant.

Before RAO and FORD, Judges

RAO, Chief Judge: The merchandise involved in this case, described on the invoice as wall hangings, was imported from Poland and entered at the port of New York. It was assessed with duty at 40 per centum ad valorem under item 366.30 of the Tariff Schedules of the United States, as towels of woven vegetable fibers, except cotton. It is claimed to be dutiable at 13½ per centum ad valorem under item 387.30 of said tariff schedules, as articles of vegetable fibers, except cotton, not specially provided for, or under item 366.84, as other furnishings, not ornamented, of vegetable fiber.

The pertinent provisions of said tariff schedules are as follows:
Schedule 3, part 5, subpart C:

> Subpart C headnotes:
> _____
> 1. For the purposes of this subpart, the term "*furnishings*" means curtains and drapes, including panels and valances; towels, napkins, tablecloths, mats, scarves, runners, doilies, centerpieces, antimacassars, and furniture slipcovers; and like furnishings; all the foregoing of textile materials, and not specially provided for.
>
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;
>
> Other furnishings, not ornamented:
> Of vegetable fibers:
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;
> Towels:
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;
> Of vegetable fibers, except cotton:
> Woven, except pile or tufted construction:

336.30 With not over 100
yarns per square
inch, counting
warp and filling____ 40% ad val.

\* \* \* \* \* \* \*

Other:

\* \* \* \* \* \* \*

Other:

\* \* \* \* \* \* \*

Of vegetable fibers, ex-
cept cotton:

\* \* \* \* \* \* \*

366.84 Other _____ 13.5% ad val.

Schedule 3, part 7, subpart B:

Articles not specially provided for, of tex-
tile materials:

\* \* \* \* \* \* \*

Other articles, not ornamented:

\* \* \* \* \* \* \*

Of vegetable fibers, except cot-
ton:

\* \* \* \* \* \* \*

387.30 Other _____ 13.5% ad val.

At the trial plaintiff called four witnesses and the defendant called six. In addition a number of exhibits were introduced into evidence. Plaintiff's witnesses were:

Mr. Joseph Hedaya, secretary-treasurer of Hedaya Bros., Inc., whose business is the printing and selling of various linen wall hangings, linen towels, terry towels, and beach towels.

Mr. Joseph D. Beyda, vice-president of Town & Country Linen Corp., which manufactures and sells place mats, linen towels, calendar hangings, bath mats, pictures, and hand-painted pictures.

Mr. Adolph Berli, president of Linen Trading, Inc., which is agent for the Polish linen industry in the United States.

Mr. Michael Vincent Basile, decorative linen buyer of Felix Lilienthal & Co., which engages in buying all sorts of decorative linens for the home for retailers across the country.

Defendant called:

Frederick Stephen Waite, vice-president of Stevens Linen Associates, Inc., American manufacturer of towels, toweling, yarns,

upholstery fabrics, and related items, such as place mats, and napkins.

Edward S. Concheiro, president of Stevens Linen International, Inc., a subsidiary of Stevens Linen Associates, Inc.

Mrs. Jane Howland, homemaker.

Mrs. Vivian Lewis, switchboard operator for the Department of Justice.

Mrs. Marion S. Frissell, office clerk.

Mrs. Josephine Palumbo, housewife.

It was agreed that four other witnesses would have testified substantially in the same manner as Mesdames Howland, Lewis, and Frissell.

A sample representative of the imported merchandise was received in evidence as exhibit 1. It consists of a piece of linen cloth about 29 inches long and 16 inches wide, having a one and a quarter-inch hem at the top, a quarter-inch hem at the bottom, and selvages on both sides. According to the record, after importation, it is printed with a design and a calendar, a wooden dowel is inserted in the larger hem, a string is inserted in the dowel, and the article is rolled up, put into a gift box, and sold as a calendar wall hanging or a calendar towel. An example was received in evidence as exhibit 2. Plaintiff claims that exhibit 1 is an unfinished calendar wall hanging, and defendant that it is an unfinished towel. The witnesses were in agreement that the finished article is known in the trade as a calendar towel, but did not agree that it is in fact a towel. For convenience, the designation "calendar towel" will be used in this opinion.

Under General Interpretative Rule 10(h) of the Tariff Schedules of the United States, unless the context requires otherwise, a tariff description of an article covers such article whether finished or not finished. Thus, two questions are involved in the determination of the controversy here: Whether the imported article is an unfinished towel or is dedicated for use in the manufacture of calendar towels and is therefore an unfinished calendar towel, and, if the latter, whether calendar towels are towels or wall hangings for tariff purposes.

Two of plaintiff's witnesses, Mr. Hedaya and Mr. Beyda, testified that they did not sell merchandise like exhibit 1 in its imported condition. They had never used it for anything other than having it made into calendar wall hangings such as exhibit 2, the reason being the size of the hem at the top which was designed for the purpose of inserting a wooden dowel. They said they did not buy or sell such merchandise as towels because a towel does not have that sort of hem at the top and a different sized one at the bottom. Towels have hems of equal size, about one-fourth to three-eighths of an inch wide. The hem of exhibit

1 prevents it from being a towel. It serves the dual purpose of preventing unraveling and of holding a dowel.

Mr. Hedaya testified that his firm also makes linen towels, an example of which was received in evidence as exhibit 3. It is about the same size as exhibit 1, has selvages on the long sides and a quarter-inch hem on both ends. It is imprinted with a design depicting two roosters, so placed that when the towel is folded in the middle and hung on a rack a rooster will be shown on each side. Both Mr. Beyda and Mr. Berli testified that they would not use cloth with an inch or an inch and a quarter hem to make kitchen towels because it would be more expensive and a waste of material.

Mr. Berli sells merchandise such as exhibit 1 to various customers in the United States as blanks for wall hangings. When he orders such merchandise from Poland, he describes it as blanks with balloon hems, the latter term indicating a hem of about an inch wide which is left open to enable a dowel to be inserted. On the other hand, he orders merchandise such as exhibit 3 as blanks or towels. It differs from exhibit 1 principally in having identical hems at both ends. Exhibit 1 is more expensive because more material is used. Exhibit 3 would not be a good delivery for exhibit 1 because it would not serve the same purpose, not having a balloon hem into which a dowel could be inserted.

Mr. Basile had never bought merchandise such as exhibit 1 as a towel because it had no use for the Decorative Linen Department. He did not know of any balloon hemmed article being offered to the trade as a towel. The witnesses knew of no towels which had such large hems except fine face towels which were hemstitched.

Defendant's witness Waite testified that his firm manufactures merchandise similar to exhibit 1, a sample of which was received in evidence as exhibit F. He said it was a towel, pointing out that it was woven on a towel loom, was of crash linen, had a coarse weave and was rather loosely woven. It was hemmed at both ends to prevent fraying, and, in order to take advantage of additional absorption areas, it had a selvage on the long sides. It was within the size range of towels, which runs from 15 to 18 inches wide and 26 to 32 inches long. He said that in its imported condition it could be used as a towel but it was not sold to the retail trade as a towel because it was not decorated enough.

Mr. Waite stated that articles in the condition of exhibit 1 or F are towels to be finished further and would probably be made into calender towels. His firm sells articles such as exhibit F to converters who do additional work on them and also sells the finished articles directly to the trade. According to this witness, converters use the merchandise to make towels, either calendar towels or decorative towels of some type. His firm uses balloon hemmed articles to make a few hanger

towels which are used to decorate, as well as calender towels. He did not know of any converter who had used balloon hemmed articles other than to make calendar towels or other hanging textile articles.

In order for merchandise to be considered a particular article, unfinished, it must be more than a mere material available for a number of uses. It must be so far advanced that it possesses the elementary form and substance of the article and must be commercially unsuitable for any use. *Paramount Import Export Co. et al.* v. *United States*, 45 CCPA 2, C.A.D. 677 (1958), and cases cited. If an article is designed and manufactured with a single purpose in mind and is made to specifications which peculiarly adapt it to that purpose, it is properly considered to be dedicated to that purpose despite the fact that it may happen to be used in other situations where no use is made of its special features of design. *United States* v. *F. B. Vandegrift & Co., Inc.*, 44 CCPA 15, C.A.D. 628 (1956).

In *Nyman & Schultz* v. *United States*, 14 Ct. Cust. Appls. 432, T.D. 42060 (1927), it was held that thin strips of steel, an inch wide, perforated at intervals to fit a Gillette safety razor, to be finished into safety razor blades, were unfinished blades for safety razors although they were used to some extent for making knives and scrapers. The court held that the width, thickness, temper, polish, and kind of perforations, all dedicated them to the single use as safety razor blades. This was regarded as a dedication to a single purpose regardless of what the article might be used for after having been so dedicated.

In *Snow's United States Sample Express Co.* v. *United States*, 8 Ct. Cust. Appls. 17, T.D. 37161 (1917), the court pointed out that to constitute an unfinished article of cotton cloth, the material must have acquired special characteristics which do not properly belong to cotton cloth or a form and individuality which identified it as a definite particular article so advanced that it was committed to a specific use and no longer available for general purposes. In that case it was held that pieces of cotton cloth printed with designs repeated at regular intervals throughout their length, generally used for making bedspreads, but suitable also for making curtains, table spreads and couch covers, were not dutiable as articles made from cotton cloth but as cotton cloth, printed.

However, in a subsequent case, *United States* v. *M.H. Rogers, Inc.*, 18 CCPA 271, T.D. 44448 (1930), involving upholstery fabrics, imported in running lengths with large woven figures at the bottom and smaller figures at the top, so arranged that by cutting between the figures the fabrics were adaptable for use as coverings for backs and seats of chairs, it was held that the merchandise was dutiable as manufactures of wool, rather than as woven fabrics. The court held that the identity of the articles, chair backs and chair seats, had been fixed

with certainty and that the imported fabrics were not commercially capable of any other use.

The testimony of the witnesses herein establishes that merchandise such as exhibit 1 is used almost entirely in the making of calendar towels. Its distinguishing feature is the one or one and a quarter-inch hem which is designed and used for the purpose of inserting a dowel and string for hanging. While the merchandise could theoretically be used in its imported condition as a towel or could be made into a kitchen towel, the evidence indicates that it is not saleable commercially as a towel without decoration, nor is it used commercially to make kitchen towels since it would be more expensive and wasteful of material to use an article with a wide hem for that purpose. There is some evidence that merchandise like exhibit 1 is used to make decorative hangings other than calendar towels, but there is no evidence that it was used to make ordinary towels.

We conclude that the use of the imported merchandise, exhibit 1, has been fixed with certainty and it is not commercially suitable for any other use. It is dedicated to use in the making of calendar towels and is an unfinished calendar towel.

The next question is whether calendar towels are towels for tariff purposes.

As already stated, the article represented by exhibit 2 is known in the trade as a calendar towel. It is made with merchandise such as exhibit 1, on which are printed a calendar and other decorations. A dowel is inserted in the larger hem and a string for hanging is added. It is rolled up and placed in a box for sale at retail. The dowel and string are included in order to hang the item on the wall and the article is never sold without them. They are considered part of the calendar towel.

According to the witnesses the merchandise is sold to the linen and domestic department of department stores, to gift departments, gift shops, discount stores, and picture shops. Mr. Concheiro testified that he dealt directly with the towel buyer at Sears but that he usually sells to a linen and domestic buyer. Such buyers purchase sheets, pillowcases, tablecloths, mats, napkins, doilies, embroidered items and mattress covers, as well as towels.

The principal witnesses had seen calendar towels displayed in stores unrolled and hung up by the string, often on racks furnished by the suppliers. Mr. Beyda had also seen such merchandise displayed hanging on a wall at gift shows in many parts of the country. Mr. Concheiro had designed the sales rack provided by Stevens Linen International. It is depicted on some of the Stevens brochures (collective exhibit C) showing a number of different calendar towels hanging from swinging rods attached to a vertical pole.

Plaintiff's witnesses testified that the term "calendar towel" was used to designate the merchandise in order that it might be sold to domestic buyers who purchase for towel and domestic departments of stores. One witness felt it was a misnomer. On the other hand, Mr. Waite testified that his firm had originated the calendar towels and that the designation was used because the article is a towel. He considers it a towel because it is woven of linen on a towel loom, is hemmed like a towel, and has the absorbency of a towel. In his opinion the calendar portion is merely decorative.

Mr. Hedaya testified that the article is offered and sold to the trade to be used as a calendar wall hanging and not as a towel. He knew of no use for it except as a wall hanging; that was its primary purpose. Mr. Basile said it was primarily a wall hanging which could be used in any room of the house, including kitchen, living room, den or bedroom.

There was received in evidence as exhibit A a circular which Hedaya Brothers distributed to its customers. It depicts various calendar towels for 1968, including exhibit 2. It is headed "Calendar Towels on Imported Linen." On the bottom it is stated: "Each calendar is individually packed with mahogany dowel and braided string to match for hanging purposes." Mr. Beyda testified that his firm advertises the merchandise as a calendar towel which is to be used for hanging, but that exhibit 3 is advertised as a kitchen towel which is used for drying and wiping.

Various brochures of Stevens Linen Associates, Inc., were received in evidence as collective exhibit C. Mr. Waite testified that they are mailed out to department store buyers throughout the trade, chain buyers, and linen and domestic buyers. Several are entitled "Decorative Towel Review" and illustrate various calendar towels with dowel and string. They are designated as calendar towels and calendar hanging towels. Some of the brochures show items apparently much narrower than merchandise such as exhibit 2. As to these, one of the leaflets states: "Here is a spritely collection of narrow contemporary styled calendar towels—the perfect solution for the space conscious woman."

Several witnesses testified that calendar towels are sold in retail shops from August through the end of the year but that other towels are sold all year long. Any calendar towels that are left over at the end of a year are sold at reduced prices.

It is clear from the testimony of all the witnesses that articles such as exhibit 2 are hung on the wall and used initially as calendars during the year represented. Thereafter the dowel and the string may be removed and the cloth portion used as a kitchen towel for wiping. Some of the witnesses testified that they regularly purchased calendar

towels and used them in that fashion. There are a number of such used cloths in evidence and it appears that after many washings the calendar designs have faded or been obliterated.

One of the witnesses, Mrs. Palumbo, testified that in 1968 she had received two calendar towels. Therefore, she hung one up and took the dowel out of the other and started to use it as a wiping cloth.

Mr. Concheiro testified that items such as exhibit 1 are printed with calendars as a sales gimmick in order to sell more merchandise. He said that the calendar towels were more attractive to consumers—that they are actually getting two for the money, a decorative item and a kitchen towel. Mrs. Holland stated that she had purchased articles like exhibit 2 because she enjoyed the double use of it, as a calendar for one year and as a dish towel for many years thereafter.

Towels are defined in dictionaries as follows:

> Funk & Wagnalls New Standard Dictionary, 1956 edition:
>
> towel, n. 1. A cloth, usually of linen, for drying anything by wiping— especially after washing it; as, a bathing *towel*, dish *towel*.

> Webster's New International Dictionary, 2nd edition (1957):
>
> towel, n. 1. A cloth, used for wiping, esp. one used for drying anything wet; as a bath or dish *towel*. * * *

> Webster's Third New International Dictionary (1966):
>
> towel 1: a piece of absorbent cloth or paper often rectangular in shape for wiping or drying (a bath~) (a dish~)

It has been held that a tariff provision for towels is an *eo nomine* designation by use and that in determining whether or not an article is a towel, it is the chief use that is controlling. *National Rag & Waste Co.* v. *United States*, 73 Treas. Dec. 814, T.D. 49564 (1938). In that case there was evidence that unhemmed pieces of cotton cloth, 36 by 36 inches were bought, sold, and known in the trade as towels, tea towels and dish towels, and that they were not used for any other purpose than as dish towels for drying purposes. They were held dutiable as cotton towels.

In *Leon Meyer, Inc.* v. *United States*, 7 Cust. Ct. 101, C.D. 544 (1941), so-called stable rubbers, pieces of cloth 28 by 35 inches, having fast edges on both sides and hemmed at both ends, chiefly used for rubbing down horses after exercise, and for other wiping purposes, were dutiable as towels.

The definitions and the cases cited indicate that a towel is a piece of cloth used for wiping or drying. The record here establishes that a calendar towel consists of more than a piece of cloth; it includes a dowel and a string. Its initial purpose is as a decorative calendar hang-

ing and it is so used for at least the particular calendar year. Thereafter, the dowel and string may be removed and the cloth portion used as a towel. The latter use may last for a number of years, as several of the witnesses testified. However, it is only a part of the article that is so used, not the entire calendar towel. Thus, the only use of the entire article is as a wall hanging and not as a towel for wiping.

The designation of the article as a calendar towel does not make it a towel. *Sears, Roebuck and Co.* v. *United States*, 46 CCPA 79, C.A.D. 701 (1959) (merchandise known as a "food umbrella" is not an umbrella) ; *Ross Products, Inc.* v. *United States*, 46 Cust. Ct. 8, C.D. 2226 (1961) (an eggcup is not a cup).

The merchandise here is a decorative calendar hanging printed on toweling material, having a dowel and a string. Exhibit 2 is within the size range of towels, but there are other articles of narrower width which are also called calendar towels. (Exhibit 5 and collective exhibit C.) It is evident that the term is one of convenience in the trade and may well have been devised in order to sell the merchandise to as many departments of stores as possible. It is an abbreviated description of a calendar hanging printed on towel material, but it does not make the article a towel, as that term is commonly understood.

We conclude that articles known as calendar towels are not classifiable as towels. Consequently, the imported merchandise, represented by exhibit 1, was not properly classified under item 366.30, as an unfinished towel. We hold that it is properly dutiable at 13½ per centum ad valorem under item 387.30 of the Tariff Schedules of the United States, as articles of vegetable fibers, except cotton, not specially provided for. Plaintiff's alternative claim under item 366.84, as other furnishings is untenable, since the merchandise is not furnishings as that term is defined in headnote 1 to subpart C, part 5, of schedule 3.

The protest is sustained to the extent indicated. Judgment will be entered accordingly.