(C.D. 4009)

STRICKLAND ENTERPRISES, INC.
W. J. BYRNES & CO. OF N.Y., INC. } *v.* UNITED STATES

United States Customs Court, Third Division

(Decided April 28, 1970)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* of counsel) for the plaintiffs.

*William D. Ruckelshaus*, Assistant Attorney General (*Glenn E. Harris* and *Robert E. Burke*, trial attorneys), for the defendant.

Before RICHARDSON and LANDIS, Judges

LANDIS, Judge: This protest involves the classification of quartz crystal blanks imported from Japan. Customs at New York assessed

the blanks at 15 per centum ad valorem under the so-called basket provision for nonmetallic minerals and products, Tariff Schedules of the United States (TSUS), schedule 5, item 523.91, as follows:

Schedule 5, part 1, subpart K:

Mineral substances, and articles of mineral substances, not specially provided for:

\*     \*     \*     \*     \*     \*     \*

Other:

523.91      Not decorated_____ 15% ad val.

Plaintiffs' claim, in chief, that the crystal blanks should be classified as parts for mounted piezo-electric crystals, dutiable at 12.5 per centum ad valorem, under TSUS schedule 6, item 687.60, as follows:

Schedule 6, part 5:

Electronic tubes (except X-ray tubes); photo-cells; transistors and other related electronic crystal components; mounted piezo-electric crystals, all the foregoing and parts thereof:

\*     \*     \*     \*     \*     \*     \*

687.60      Other _____ 12.5% ad val.

Plaintiffs have not seriously pressed their alternative claim for classification under TSUS item 688.40, the schedule 6 basket provision for electrical articles and electrical parts of articles, not specially provided for, dutiable at only 11.5 per centum ad valorem. No one questions that the tariff description "mounted piezo-electric crystals * * * and parts thereof" in TSUS 687.60 is more specific as to merchandise which, in fact or as a matter of law, fits that description, than are TSUS items 523.91 or 688.40. The latter tariff items, as we have already said, are basket classifications generally intended to cover all merchandise, not specially provided for elsewhere in TSUS.

The opposing positions in this dispute turn more on matters of law than fact. Plaintiffs contend that the statutory rules for interpreting TSUS (General Headnotes and Rules of Interpretation), in this case, rule 10, support the fact that the imported crystal blanks are unfinished parts of mounted piezo-electric crystals. General Interpretative Rule 10, in pertinent part, recites that as a matter of law:

(h) unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished;

(ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

Defendant argues that the crystal blanks are not parts, but mere materials for making parts and that, in the context of the tariff

description "mounted piezo-electric crystals", the word "mounted" is a term of limitation. As we take up and discuss the legal arguments, we are brought to sustain plaintiffs' claim under TSUS item 687.60.

The tariff description "mounted piezo-electric crystals * * * and parts thereof" is a new TSUS tariff classification. Prior tariff acts contained no classification by that name. Before turning to the record, it is well to know that a piezo-electric crystal is:

A crystalline substance which exhibits the piezoelectric effect. This "pressure electricity" was first positively identified by the Curies in 1880, when they discovered that some crystals produced electric charges on parts of their surface when the crystals were compressed in particular directions, the charge disappearing when the pressure was removed. It was later discovered that these crystals become strained when subjected to electric fields; the piezoelectric deformation is directly proportional to the field and it reverses in sign as the sign of the field is reversed. These basic properties of piezoelectric crystals are used in electromechanical transducers, such as ultrasonic generators, microphones, phonograph pickups, and electromechanical resonators, such as the frequency-controlling quartz crystals. * * *

* * * The principal piezoelectric materials used commercially are crystalline quartz and Rochelle salt, although the latter is being superseded by other materials, such as barium titanate. Quartz has the important qualities of being a completely oxidized compound (silicon dioxide), and is almost insoluble in water. Therefore, it is chemically stable against changes occurring with time. It also has low internal losses when used as a vibrator.* * *

The quartz crystal resonator is the most important class of piezoelectric device. Its principal application is in the fields of frequency control and electric-wave filters. It is also used in transducers, especially where heat or moisture are factors.

Characteristics and manufacture. The electrical properties of quartz crystals as circuit elements, including their temperature coefficient of frequency, motional inductance and capacitance, series resistance, and electrode or shunt capacitance, are largely determined by the dimensions and angles of rotation of the resonator surfaces with respect to the crystal axes * * *. In commercial practice, raw quartz crystals are oriented by means of x-ray goniometers, the required angles of rotation are measured on the mounting jig, and the required blanks (unfinished slabs) cut from the mother crystal by diamond-faced saws. The blanks are then ground to the required frequency using lapping techniques with graduated sizes of abrasives to obtain a smooth finish. Some high-quality crystals are given optically polished surfaces. It is common practice to etch the surface of the crystal with fluorine compounds to remove microscopic surface irregularities.

*Electrodes may be applied directly to the surface of the crystal, or they may be mounted externally in close proximity to the quartz element. Crystals with electrodes on their surfaces are*

*frequently mounted by means of wires, which may also provide the connections to the electrodes. Containers for crystals may be hermetically sealed for protection from atmospheric effects, and some crystals are mounted in evacuated envelopes to improve Q and reduce aging drift.* * * * [Italics added.] [McGraw-Hill Encyclopedia of Science and Technology, Volume 10, pages 216, 217.]

And that:

> * * * Quartz crystals for radio frequency control are marketed in three forms: Rough sawed blanks, cut to specified angles; semifinished blanks, machine-lapped to approximate size; and electrically finished blanks, finished by hand and electrically tested. [Materials Handbook, Brady, page 660.]

The trial record consists of samples in the same condition as the imported crystal blanks (exhibit 1, square wafer-thin blanks); samples of the raw quartz from which crystal blanks are processed (exhibit 2); a cut section of raw quartz illustrating an early step in the processing of crystal blanks (exhibit 3); photographs illustrating the surface grinder and lapping machines used in Japan to process the crystal blanks (collective exhibit 4, exhibit 5); photographs illustrating the equipment used to examine the crystal blanks for a defect known as twining, and x-ray inspection (exhibits 6 and 7); and articles illustrative of mounted piezo-electric crystals (exhibits 8 and 9). Exhibit 8 looks like a tiny receiving tube; the crystal in exhibit 8 is sealed in a clear plastic square container; exhibit 9 resembles exhibit 8 but the container is metal. Both exhibits have tiny prongs which permit them to be set in a receiver of some sort.

Gilbert Edward Strickland, Jr., treasurer of Strickland Enterprises, Inc., one of the parties in this litigation, testified for plaintiffs. Mr. John J. Carpenter, vice-president of Bulova Watch Co., and general manager of its electronics division, testified for defendant. The facts, which we deem relevant, are not in dispute.

There is little need to recount all the testimony describing the sophisticated techniques used to process quartz pieces into crystal blanks. We conclude that, in the condition imported, the crystal blanks have been "ground to * * * [a] frequency using lapping techniques with graduated sizes of abrasives to obtain a smooth finish." McGraw-Hill Encyclopedia, *supra.* The blanks are square, 450 and 460 thousandths of an inch square, allowing a plus or minus two thousandths of an inch tolerance. (R. 25.) Although the witnesses differed in their opinions as to how far the imported crystal blanks had been processed toward their ultimate use—(Witness Strickland estimated they were 70 percent completed, R. 35, Witness Carpenter estimated they were 15 to 20 percent completed, R. 50, "a partly finished article"

R. 61), the fact is that the blanks are dedicated to use in mounted piezo-electric quartz crystal units. (R. 26, 65.) Mr. Carpenter testified his company stocks crystal blanks like the imported crystal blanks because:

> * * * one of the peculiarities of the crystal business is that you can't stock a completed crystal unit, the frequency is assigned, and the crystal is ordered with that particular frequency. Therefore, we [Bulova] have to stock blanks so that we are ready to service an inquiry when it comes in for a particular crystal. [R. 48, 49.]

Asked if Bulova waited for an order before it processed the crystal blanks further, Mr. Carpenter stated "[m]ost definitely we wait until we get an order for a crystal unit" (R. 51), having earlier explained that:

> We stock these blanks in increments of a half minute, and various thicknesses, depending upon what our forecast for future sales are, and we draw them from stock to service a particular order.

> Assuming we had crystals similar to Exhibit 1, and we received an order for a 12-megacycle crystal to be operated on its fundamental mood, we would select a crystal at 35 degrees 19 minutes, and we would lap it through two additional stages, and round it to approximately one 350 inches in diameter, and we would etch it, we would base plate it, which would provide an electrode on each side of the crystal, the crystal would be mounted in a holder similar to what has been shown here, then it would be adjusted further by the addition of more plating, to bring it precisely to the frequency required. It would be sealed in its container, and then it would be checked for all of the parameters through the frequency at room temperature, frequency over an ambient range of temperatures over what the customer called for, and all parameters which may have been spelled out more in detail, such as effective resistance, in cases where the crystal might be used in a filter that would spell out the inductance requirement and tolerance, and then it would be shipped into quality control for further check, and shipped from the Department. [R. 49, 50.]

In the absence of legislative history to the contrary, the record supports our own opinion that the TSUS term "mounted piezo-electric crystals" describes, *eo nomine*, finished crystal units ready for use as parts in frequency receivers. (R. 65.) The tariff term "mounted piezo-electric crystals" manifestly describes an article of commerce. The term is not ambiguous and we are not led to read it ambiguously, *F. L. Smidth & Company* v. *United States*, 56 CCPA 77, C.A.D. 958 (1969), simply because we are unfamiliar with the term or because of the treatment of the same in the "Brussels Nomenclature". The term in Brussels refers to piezo-electric crystals "only if mounted (for

example :— in a simple mounting of glass, metal, or other material; or if coated with graphite, etc., varnished and fitted with small ribbon terminal leads)" and not "identifiable as a specific part of a machine or appliance * * *" in which case "the assembly is classified as a part of the machine or appliance in question". (Explanatory Notes to the Brussels Nomenclature, Volume III, Heading 85.21, page 967.) Defendent does not rely on the Brussels Nomenclature for support, and as explained in the explanatory notes, *supra*, the Nomenclature includes classifications which TSUS does not presume to adopt, namely, a classification for unmounted cut elements of piezo-electric materials (Brussels Heading 38.19(A)(41), and a classification for piezo-electric quartz cut or otherwise worked, but not mounted (Brussels Heading 71.02).

The difficulty with defendant's argument that these crystal blanks are mere material, and not parts, is that it does not square with the statutory definition of "parts". The interpretative rule states that a provision for parts of an article, in this case, parts for a mounted piezo-electric crystal, covers a product solely or chiefly used as a part of such article. The rule, in some respects, is a modification of the oft-quoted judicial rule that:

> * * * "An article commercially suitable and commercially used for the making of different things is a material which is just as much adapted to the production of all of them as it is to the production of any one of them, and until it has been finally appropriated to some definite manufacturing use and has been given the distinguishing characteristics which clearly identify it as one of the components ultimately to be assembled into a particular completed whole, it can not be regarded as a part of any specified manufacture." While this rule was applied in defining "parts," it also applies to determining the application of the word "unfinished." * * * [*Nyman & Schultz* v. *United States*, 14 Ct. Cust. Appls. 432, 437, T.D. 42060 (1927).]

On this record, the fact of the matter is that the imported crystal blanks have no other use than in making mounted piezo-electric crystals. Indeed, Bulova stocks and inventories crystal blanks, in the same condition as the imported blanks, for that purpose. Defendant suggests that only when the blanks have been further processed to "crystal plates" (R. 51; defendant's brief, page 15) in connection with an order for mounted piezo-electric crystals of a particular frequency are they a part of the mounted piezo-electric crystal unit. Substantially the same argument was made in the United States Supreme Court by a petitioner seeking refund of tax assessed on forged shell bodies under the Munition Manufacturers' Tax Act of 1916, imposing a tax on the profits of every person manufacturing

projectiles, shells, or torpedoes, or any part of any such article. We can answer defendant no better than to quote what the Supreme Court said, as follows:

> A shell is a definite article, constituted of materials of a certain kind and quality, assembled and fitted and finished so as to be adequate for its destructive purposes. Is not every element (we use the word for want of a better) in the aggregation or composition or amalgamation (whichever it is), of a shell, a part of it? If not, what is it? And what is the test to distinguish a part from not a part? We use the negative as an antithetic word does not occur to us to express that something necessary to constitute a thing is not a part of it. Petitioner surmounts the difficulty by contending that the law, by its words "any part" of any of the "shells," implies a substantially finished part, as related to the whole structure and to the purpose it is intended to subserve. "Otherwise," counsel say, "the word [part] loses all precision, and becomes equivalent to the words 'ingredient' or 'material composing or making up.'" And to sustain this view they take us to the dictionaries and to an enumeration of the processes to which the material must be subjected to make a forging, and those afterwards to prepare it for a shell. In this enumeration letters of the alphabet are used of which "A, B, C, and H represent stages of development of the material prior to delivery" to the Midvale Company, and "D, E, F, G, I, and K represent stages of development by Midvale after delivery to it." It is quite obvious, of course, as counsel declare, that the forgings were "not *shells*; since a shell is a composite structure of several parts." But counsel go farther and say that the forgings were "not *parts of shells*, in any practical and legal sense, because their development was so far short—80 percent—of the point where they could be related to or combined with any other component of the shell structure, that they could not satisfy any fair meaning of the shell body unit as entering into the composite shell as a whole." We give counsel's words because we fear that by paraphrasing them we might not correctly represent their meaning and contention.

> We reject the contention. Congress did not intend to subject its legislation to such artificialities and make it depend upon distinctions so refined as to make a part of a shell not the taxable "part" of the law. Besides, petitioner understates its work. It did not deliver raw material to the Midvale Company. Certain processes had been performed on the material, giving it a shape adapted to its destination. It was made cylindrical, hollow, with one end closed. It was rough, it is true, but an advance upon the raw material. [*Worth Brothers Company* v. *Lederer*, 251 U.S. 507, 509, 510 (1920), emphasis quoted.]

Defendant's further argument that the tariff term "mounted piezo-electric crystals" is limited by the term "mounted", and applies only to parts of "*mounted* piezo-electric crystals", is diffuse. If "Congress very clearly intended", as defendant says, "to fully exclude unmounted crystals from the entire item" (defendant's brief, page 20), then the

parts which defendant enumerates as parts, namely "electrodes, bases, covers, wire", are themselves excluded, since those are some of the very parts, as we understand the facts, that are used in mounting piezo-electric crystals. To explain further, a mounted piezo-electric crystal is a definite article made up of assembled parts. Once assembled it is the article classified and there are no parts. What defendant argues is an anachronism. The use in TSUS "of a tabular arrangement or system for the classification provisions with superior tariff descriptions subdivided into inferior descriptions," (Tariff Classification Study, Submitting Report, page 9) also tells us that when TSUS intends the limitation defendant insists upon, it does so by subdividing a superior heading with inferior headings, i.e. a superior heading like "mounted piezo-electric crystals * * * and parts thereof", is subdivided into an inferior TSUS heading, limiting classification to "mounted piezo-electric crystals", without mention of parts. The tariff description "Other" in item 687.60, therefore, covers all "importations, whether complete articles or parts, encompassed by the superior heading [mounted piezo-electric crystals and parts thereof], but not specifically enumerated in the several subordinate tariff descriptions." *Arthur J. Humphreys* and *Packard-Bell Electronics* v. *United States,* 59 Cust. Ct. 231, C.D. 3128, 272 F. Supp. 951 (1967), aff'd 56 CCPA 67, C.A.D. 956 (1969).

While we are bothered somewhat by the failure of this record to clarify what the apparently unfinished "mounted piezo-electric crystals", which the Brussels Nomenclature refers to, are, the quoted term without the explanation in Brussels, unambiguously addresses itself to finished "mounted piezo-electric crystals". We do not believe that the ambiguity introduced by the explanation in Brussels should be extended to the otherwise unambiguous term "mounted piezo-electric crystals" and "parts thereof" in TSUS. *F. L. Smidth & Company* v. *United States, supra.* So read, we must accept the fact that this record establishes that these imported piezo-electric crystal blanks are a product solely or chiefly used as a part of "mounted piezo-electric crystals" and therefore are "parts thereof", in the absence of a specific provision for such parts (as in Brussels, *supra*) under TSUS General Interpretative Rule 10(ij). If there were imported into our commerce mounted piezo-electric crystals, like those referred to in the Brussels Nomenclature, they would, in our opinion, still be classifiable under TSUS item 687.60 as unfinished mounted piezo-electric crystals per force General Interpretative Rule 10(h).

The protest claim under TSUS item 687.60 is sustained. The claim under TSUS item 688.40 is dismissed.

Judgment will be entered accordingly.