ARMBEE CORPORATION, and W. J. Byrnes & Co., Inc.

v.

UNITED STATES.

C.D. 3278; Protest No. 66/2244–108783.

United States Customs Court, First Division.

Feb. 6, 1968.

Glad & Tuttle, San Francisco, Cal., and Barnes, Richardson & Colburn, New York City, Assoc. counsel (Joseph Schwartz, New York City, George R. Tuttle, San Francisco, Cal., and Earl R. Lidstrom, New York City, of counsel), for plaintiffs.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Bernard J. Babb, New York City, trial attorney), for defendant.

Before WATSON and BECKWORTH, Judges.

WATSON, Judge:

The protest in this case involves an importation of certain plastic artificial flowers described on the invoice as "AP/37 Poinsettia Branch", "AP/36 Poinsettia Spray", and "AP/1 Poinsettia Spray". It was stipulated that the involved articles are in chief value of plastic (R. 3).

The merchandise in question was classified under item 748.20 of the Tariff Schedules of the United States and assessed with duty at the rate of 28 per centum ad valorem as artificial flowers, wholly or almost wholly of plastics. Plaintiffs contend that the imported articles are properly dutiable under item 774.60 of the Tariff Schedules of the United States at the rate of 17 per centum ad valorem as "other" articles, not specially provided for, of rubber or plastics. The claim originally filed by plaintiffs or classification under item 772.97 as "other" Christmas ornaments was abandoned at the trial (R. 2). This case is one of two cases involving the identical issue of whether polyethylene plastic artificial flowers of which parts have been assembled by the so-called "snap-on" or "pressure fit" method are dutiable as artificial flowers under item 748.20 of the tariff schedules. The other case is Zunold Trading Corporation and Leading Forwarders, Inc. v. United States, 60 Cust.Ct., C.D. 3279, protest 66/14834, decided concurrently with the case at bar.

Specifically, plaintiffs in this case contend that the artificial flowers in question are excluded from classification under item 748.20 of the tariff schedules "by reason of headnote [1] (iii) of subpart B of part 7 of schedule 7", which reads as follows:

\* \* \* \* \* \*

(iii) articles consisting of parts assembled otherwise than by binding with flexible materials such as wire, paper, textile material, or foil, or by gluing, or by similar methods; \* \* \*

The statutes herein involved under which the merchandise was classified and claimed, are as follows:

Item 748.20 of the Tariff Schedules of the United States:

Artificial flowers, trees, foliage, \* \*, parts of the foregoing (except articles provided for in item 748.15 or 748.40 of this subpart):

Wholly or almost wholly of plastics ......28% ad val.

Item 774.60 of the Tariff Schedules of the United States:

Articles not specially provided for, of rubber or plastics:

\* \* \* \* \* \*

Other ...............17% ad val.

The record herein consists of the testimony of three witnesses for the plaintiffs and the following exhibits:

Plaintiffs' exhibit 1 - Sample of AP/37 Poinsettia Branch.

Plaintiffs' exhibit 2 - Sample of AP/36 Poinsettia Spray.

Plaintiffs' exhibit 3 - Sample of AP/1 Poinsettia Spray.

Plaintiffs' illustrative exhibit 4 - Sample of wire, paper, cellophane, and foil flower.

Plaintiffs' illustrative exhibit 5 - Sample of paper flower.

Plaintiffs' illustrative exhibit 6 - Sample of cotton flower.

Plaintiffs' illustrative exhibit 7 - Sample of crepe paper flower.

One of the witnesses for the plaintiffs was Mr. Chan Kin, a partner in the Man Yan Plastic Factory of Kowloon, who testified through an interpreter, Richard Fung (R. 4–6). The other witnesses were Mr. Robert M. Betette, president of importer-plaintiff, Armbee Corporation (R. 26), and Mr. Samuel S. Berger, president of First American Artificial Flowers, Inc., who has been in the artificial flower business since 1933 (R. 38) and who, it appears, is exceptionally qualified in the plastic artificial flower industry and who, in addition, has imported flowers of paper, cloth, and other materials, since 1910.

As disclosed by the record, the involved merchandise is made in the following manner:

A wire cut to length and coated with a thin plastic is placed into an injection mold, and polyethylene plastic, which has been colored, is poured into it. When the product is removed from the injection mold, the main stem and branches are completed. The wire is encased in the plastic by reason of the melting of the plastic through the application of heat and pressure. The leaves are produced in the same manner by the use of another injection mold and are attached to the main stem by slipping the hole in the leaf onto the protrusion on the stem (R. 11–16).

Mr. Chan testified that no paper, textile material, foil, gluing, or tying wire was employed in producing the articles. He explained that the flowers are attached to the main stem by snapping them onto a small ball on the main stem (R. 17–18). The method of production of all the flowers in question is substantially the same, except for plaintiffs'. exhibit 3 in which "the leaf is slipped entirely into the branches", but the flowers are attached by the "snap-on" method (R. 19). The witness demonstrated how the flowers and leaves are snapped on and off the stem or branch indicating that the flowers and leaves can be easily removed, and snapped back in (R. 19–20).

On cross-examination, Mr. Chan testified that the dimensions of the injection mold that was used in the manufacture of the component parts of plaintiffs' exhibits 1, 2, and 3, are "according to the size of the flower", with a "2-inch space on each side." The protrusion on the main stem and the holes in the leaves are formed by the injection mold (R. 22). He further testified that, in placing a leaf on plaintiffs' exhibit 1, there was some resistance and that he had to push it in order for the leaf to hold (R. 23). The holes in the stamens and flowers are somewhat smaller than the protrusions on the stems, which help to hold them to the protrusions (R. 22–25). On redirect examination, Mr. Chan testified that the wire for the main stem is put through a machine which places the thin plastic coating on it (R. 25–26).

Mr. Robert M. Betette, heretofore identified, testified that his company is in the business of importing artificial flowers, housewares, gift wares, and sundry items for resale. He stated that he was familiar with the construction of plaintiffs' exhibits 1, 2, and 3, and that, in the course of his business, he had received samples of artificial flowers that were different in construction from exhibits 1, 2, and 3. (R. 27). The witness identified plaintiffs' exhibit 4 as a sample which he had received from a trading house in Japan, stating that there was a difference in manufacture between this exhibit and plaintiffs' exhibits 1, 2, and 3. Plaintiffs' exhibit 4 was introduced in evidence for the purpose of "showing that there are different methods of attaching to the stem" (R. 29). As described by plaintiffs' witness, plaintiffs' exhibit 4 "consists of wire, paper, which is wrapped up to a leaf that has a·wire in it," and foil which was wrapped around to hold the leaves on, so that the leaves are attached to the stem by holding them in place and wrapping the foil (R. 32). Mr. Betette stated that, by reason of the materials from which they are made and the manner of manufacture, the leaves cannot be removed from exhibit 4 without tearing but that, in

the case of exhibits 1, 2, and 3, the leaves may be taken apart and reassembled without damaging (R. 33, R. 36). He stated that plaintiffs' exhibit 5 differs from plaintiffs' exhibit 4 in that the former exhibit is wrapped with paper whereas the latter is foil wrapped, the leaves on exhibit 4 being made out of cellophane (R. 35).

Mr. Samuel S. Berger testified that he has seen flowers similar to plaintiffs' exhibits 1, 2, and 3 being manufactured, having designed most of them (R. 40). The witness further testified that he was familiar with plaintiffs' exhibits 4, 5, 6, and 7 by reason of having designed these items, and that the difference between these articles and plaintiffs' exhibits 1, 2, and 3 is in the method of assembly, the latter requiring no outside material to assemble them with (R. 42–43). Plaintiffs' exhibits 1, 2, and 3 are made of a "self-contained" type of material of polyethylene plastic for which no glue or adhesive has been devised that will make these flowers stick to one another and that the ball and socket method or pressure fit method of assembly has been designed to assemble these particular flowers, the pressure fit keeping the two parts together (R. 43–46). Mr. Berger then testified that, with respect to plaintiffs' exhibits 4, 5, 6, and 7 "still currently being made in vast quantities throughout the world", (R. 46), glue, flexible tape of paper or foil, and wire had to be employed, without which such flowers could not be manufactured (R. 47). Plaintiffs' exhibits 4, 5, 6, and 7 have the tape method of assembly, plaintiffs' exhibit 7 being first bound together with a "tying" wire. Plaintiffs' exhibit 7 is made of crepe paper and plaintiffs' exhibit 6 is made out of coated cotton cloth (R. 48). In the opinion of the witness, plaintiffs' exhibits 1, 2, and 3 do not consist of parts "assembled by binding with flexible material" or by gluing or "by similar methods" (R. 49). Plaintiffs' exhibits 4, 5, 6, and 7 require more hand labor than plaintiffs' exhibits 1, 2, and 3, inasmuch as the latter exhibits are made by hand cutters,

hand coloring, hand assembly, and hand reinforcing (R. 49–50). Mr. Berger further testified that there are numerous methods of making artificial flowers, including assembly by glue or tape or tying wire, as well as the method used in making plaintiffs' exhibits 1, 2, and 3. The witness stated that there are other plastics used in making artificial flowers, such as polyvinyl, polystyrene, and linear polyethylene and that polystyrene can be glued, although only in a limited application in a flower base, because of its stiffness (R. 52).

As heretofore indicated, the issue in this case is whether the plastic artificial flowers in question are excluded from classification under item 748.20 of the Tariff Schedules of the United States by reason of the exclusionary language contained in headnote 1(iii) of schedule 7, part 7, subpart B, supra.

Plaintiffs contend (plaintiffs' reply brief page 2) that the use of the word "with" after the word "binding" in schedule 7, part 7, subpart B, headnote 1(iii), clearly implies that "the assembly must be accomplished *with* some flexible material other than the components being assembled." The defendant, on the other hand, maintains that since the polyethylene material from which the imported articles are made is a flexible material, "the imported merchandise has been assembled by a binding with a flexible material, and, therefore, is not excluded from classification under item 748.20."

It would appear from the language of headnote 1, supra, that some types of "artificial flowers" are excluded from the provision therefor in item 748.20 of the Tariff Schedules of the United States. The Government, in its brief, directs our attention to the Tariff Classification Study of November 15, 1960, schedule 7, pages 353–355, where there is indicated certain "problems" that were present in connection with the classification of merchandise as artificial flowers under paragraph 1518 of the Tariff Act of 1930, as a result of which the framers of the tariff

schedules inserted headnote 1, supra, to limit the scope of the provision for "artificial flowers", and to exclude, among others, from the provisions of item 748.-20, supra, (iii) "articles consisting of parts assembled otherwise than by binding with flexible materials such as wire, paper, textile material, or foil, or by gluing, or by similar methods; * * *." Here, as appears from the record, the artificial flowers or foliage were made by molding separately the various petals or leaves and the main stem. Each flower or leaf part had a "socket" which was usually located at the base of the part involved. The main stem contained small protrusions ending with "balls" over which the "sockets" were slipped in order to assemble the flower or foliage. In our opinion, the articles here in question are not assembled by binding with flexible material or gluing. Neither are they assembled by "similar methods". Defendant claims that "binding" is not limited to securing two parts by the use of a third or "outside" component and that the articles in question are assembled by binding, that is, by stretching one flexible part over another and holding it in a snug fit. However, in view of the specific language in headnote (iii), supra, defendant's contention is, in our opinion, without merit. The primary meaning of "bind" is "to tie or confine with a cord, band, ligature, chain, etc.; to make fast with a band or bond" (Webster's New International Dictionary, Second Edition, Unabridged, 1953, page 269). While defendant in this case maintains that the "socket" itself is a flexible material which is bound around the ball, the exhibits themselves do not bear this out, unless a very broad meaning is given to the word "flexible". The exemplars of "flexible" material set forth in headnote 1, supra, are those which can be easily wound around other material, such as wire, paper, and textile materials. Accordingly, on the basis of the language alone in the headnote, it appears that the merchandise here in question falls within the exception for such articles as are embraced by head-note 1, and that the items at bar are thus excluded from classification under item 748.20, supra.

The courts are bound to determine the intent of Congress by the language which was actually used and have no right to give any meaning to such language other than that conveyed by the words, terms, or expressions in which the legislative will was expressed. , Edgar Allen Steel Co. (Inc.) et al. v. United States, 16 Ct.Cust.App. 26, 29 T.D. 42715. If Congress saw fit, as it apparently did to limit the provision for artificial flowers to those assembled by certain prescribed methods, it is not the function of the court, in construing the relevant statute, to include within the provisions for artificial flowers something which has been expressly excluded. Edgar Allen Steel case, supra.

Counsel for the defendant in its brief (page 13) points out that, if the articles in question were imported unassembled, they would qualify for classification under item 748.20 of the tariff schedules as "parts" of artificial flowers and that the interpretation of the headnote as contended for by the plaintiffs "would remove the assembled articles from the same classification and place them elsewhere" and thus perpetuate an anomaly which, it states, headnote 1(iii) was intended to eliminate. In effect, defendant maintains that, if the construction contended for by the plaintiffs was approved, it would result in the "assembled" articles having a lower rate of duty. While such an intention is not ordinarily imputed to Congress, the statutory language itself, however, is the prime source in the determination of congressional intent. In Wilbur-Ellis Co. v. United States, 26 CCPA 403, C.A. D. 47, the court specifically found that there was no anomaly in the fact that a material (steel wire) was dutiable whereas the further manufactured product in question (bale ties) was held free of duty. So, too, in the case at bar we find, in view of the congressional intent as expressed, that the defendant's position

with respect to the so-called anomaly as to rate impositions on "unassembled" polyethylene parts of artificial flowers and the "assembled" articles is without merit.

Defendant in the case at bar points out that, as disclosed by the evidence herein, nearly all imported plastic flowers are assembled by the "snap-on" or "slip-on" method, and that "under plaintiffs' construction the greatest portion of the plastic artificial flower production would be excluded from the specific statutory provision for plastic artificial flowers". However, the background behind the enactment of the tariff schedules, confirms, in our opinion, the fact that the method of assembly in this case was not considered a permissible method. The authority to prepare new schedules was contained in the Customs Simplification Act of 1954. It appears that the Tariff Commission worked on the revision from 1954 to 1958 and, in the latter year, published a "proposed" schedule 7 which set forth headnote 1 and item 748.20 in substantially its present form (Tariff Classification Study, schedule 7, pages 556–557). As defendant itself points out, Congress must have been aware of the rising volume of plastic flowers. Its failure to amend headnote 1, as originally proposed, is significant, in our opinion, in that it demonstrates that Congress was satisfied with the limitations of assembly methods as described in headnote 1(iii). It may be noted that predecessor paragraph 1518 of the Tariff Act of 1930 covering artificial flowers did not consider the method of assembly as a test for classification. The tariff schedules on the other hand do, and on that basis, it appears that many so-called artificial flowers which would have been included in paragraph 1518 are no longer covered by the provision for artificial flowers. Here, the imported articles are excluded from classification under item 748.20 of the Tariff Schedules of the United States by the exclusionary language of headnote 1(iii), supra.

For all of the reasons above stated, we are of opinion and hold that the involved plastic artificial flowers, by reason of their assembly, are excluded from classification under item 748.20 of the Tariff Schedules of the United States, and are properly dutiable under item 774.60 of said tariff schedules at the rate of 17 per centum ad valorem as other "Articles not specially provided for, of rubber or plastics", as claimed. To the extent indicated, the protest is sustained. Judgment will issue accordingly.