(C.D. 3938)

Pacific Fast Mail, Inc.
Robert E. Landweer & Co., Inc. } v. United States

United States Customs Court, First Division

(Decided December 4, 1969)

*Glad & Tuttle* (*George R. Tuttle* of counsel) for the plaintiffs.
*William D. Ruckelshaus*, Assistant Attorney General (*Harold L. Grossman* and *John A. Winters*, trial attorneys), for the defendant.

Before Watson, Maletz, and Rosenstein, Judges

Rosenstein, Judge: The involved merchandise, invoiced as "20,000 ft. Code 70 Nickel Silver Rail Section", which was imported from

the United Kingdom in 1966, was assessed with duty at the rate of 35 per centum ad valorem as parts of toys, not specially provided for, under TSUS (Tariff Schedules of the United States) item 737.90. Plaintiffs contend that the article is not a toy, as that term has been defined, and is properly dutiable at 1.275 cents per pound and 22.5 per centum ad valorem as articles of nickel silver under TSUS item 657.30, which is under the superior heading of "Articles of copper, not coated or plated with precious metal". It is claimed, alternatively, that the merchandise is scale model railroad track and, as such, dutiable at 16 per centum ad valorem as "track, including switching track" in TSUS item 737.07 which comes under the superior heading of "Other model articles and construction kits or sets".[1]

The relevant provisions of the tariff schedules read as follows:

Classified:

Schedule 7, Part 5, Subpart E. Models; Dolls, Toys, Tricks, Party Favors

Subpart E headnotes:

1. The articles described in the provisions of this subpart (except parts) shall be classified in such provisions, whether or not such articles are more specifically provided for elsewhere in the tariff schedules, * * *—

\* \* \* \* \* \* \*

2. For the purposes of the tariff schedules, a "toy" is any article chiefly used for the amusement of children or adults.

\* \* \* \* \* \* \*

Toys, and parts of toys, not specially provided for:

\* \* \* \* \* \* \*

| | | |
|---|---|---|
| 737.90 | Other _____ | 35% ad val. |

Claimed:

Schedule 6, Part 3, Subpart G. Metal Products Not Specially Provided For

Subpart G headnotes:

1. This subpart covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules.

\* \* \* \* \* \* \*

---

[1] An alternative claim under TSUS item 657.35 has not been pressed and is hereby deemed abandoned.

Articles of copper, not coated or plated with precious metal:

657.30      Of copper, other than alloys of copper; of nickel silver or of cupronickel_____ 1.275¢ per lb. +22.5% ad val.

Alternatively Claimed:

Model trains, model airplanes, model boats, and other model articles, all the foregoing whether or not toys; and construction kits or sets for making or assembling such model articles:

\*    \*    \*    \*    \*    \*    \*

Other models, and construction kits or sets:

737.07 [Amended by Pub. L. 89–241, §§ 2(a), 70, Oct. 7, 1965, 79 Stat. 933, 947.]      Rail locomotives and rail vehicles; railway rolling stock; track, including switching track; rail depots, round houses, signal towers, water towers, and other trackside structures; trolley buses and trolley-bus systems; cable-car systems; highway vehicles; ships and harbor structures; and airplanes and spacecraft; all the foregoing made to scale of the actual article at the ratio of 1 to 85 or smaller_____ 16% ad val.

The record [2] establishes that the Code 70 rail at bar, which is imported in three foot lengths, is manufactured to exact specifications and represents a reduction in absolute scale from its prototype, the rail used in standard railroad equipment. Exhibit 1, a representative sample of the article, is thin (approximately one-eighth inch at its widest cross-section), very pliable and ridged along its length.

It was conceded by defendant that the rail is suitable only for use in the construction of scale model railroad track, such as illustrative exhibit 6, which consists of a section of multiple HO gauge track made from Code 70 rail laid down to scale on a board (to represent a section of standard railroad track).

---

[2] Plaintiffs called five witnesses, four of whom were model railroad hobbyists. One owned a model hobby shop in Seattle where he sold the rail sections in issue. The fifth witness, an employee of the importer, ordered the merchandise and supplied the specifications for manufacture. Defendant called no witnesses.

The construction of model track, which consists essentially of two parallel rails laid on a roadbed and connected with crossties, requires care, time, and great accuracy. The time taken to build track varies according to one's skill: the rails must be cut, filed, fitted, gauged and soldered. One witness testified that it takes him approximately two hours to construct one foot of straight track. Another witness, a model railroader for 17 years, who had constructed exhibit 6, stated that it was "very difficult" to build a railroad track, and described the process thusly:

A. Well, Exhibit 6 was constructed from lengths of rail such as Exhibit 1. The entire exhibit, including all of the switch or turnout sections, were constructed, or what we call built from items such as Exhibit 1. There were three foot lengths of rail, various parts were cut, filed, fitted, soldered, in order to create what we call the track section that you see here as Exhibit 6.

Q. What do you first do?—A. First we define where we want the track to go. We lay out the course of the track; in effect, we survey it if you like to use that expression; then we determine where we are going to put our switches; we lay down a diagram, build in effect a template over which the rails have been laid and gauged, and then we begin cutting, filing, soldering, fitting, and gauging the track.

Q. Do you do anything to the board itself?—A. Many, many different things can be done with the board. In this one we have done some cutting out of the board to simulate drainage ditches, simulate the roadbed on which the ballast on which the ties, and then on which the rail is laid.

Q. Then what do you do?—A. Then we spike down the rails.

Q. Do you make the ties?—A. Yes, I do make the ties. These are made from scratch, from small pieces of wood referred to as strip wood, which is usually a soft pine material. These are cut to various lengths; * * *.

Ties and spikes of the type used in building model track, and a gage, an implement used to measure the distance between rails, were received in evidence. Other tools used in building model track are jewelers' pliers and files, and a pin vise for pre-drilling spike holes.

Pacific Fast Mail, Inc. (Pacific) belongs to the National Model Railroad Association, Inc. (NMRA), which establishes standards and recommended practices in the manufacture and construction of model railroads. An NMRA manual of "Official NMRA Standards" and "NMRA Recommended Practices" was received in evidence as an illustration of these standards. Additional exhibits are a pamphlet entitled "How to Wire Your Model Railroad" and an article on "Building Code 70 Turnouts in Nickel Silver" in the April, 1961 issue of *Model Railroader*, a publication read by model railroad hobbyists. Model railroading is a diversion which is, in turn, pleasant, frustrating, re-

laxing, time-consuming and satisfying. It is taken seriously by many hobbyists who often get together at national conventions or regional meetings held by NMRA to discuss problems and exchange information.

We shall first consider plaintiffs' alternative claim under item 737.07 which is more specific than, and, if applicable, takes precedence over, item 657.30, which is limited by the Subpart G headnote [Schedule 6, Part 3] which provides that this subpart "covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules."

Plaintiffs contend that the record establishes that the importation at bar is track, or unfinished track,[3] within the purview of item 637.07, whereas defendant argues that it is a distinct article known as rail, which does not even rise to the status of *model* rail.

In light of defendant's concessions that model railroaders buy merchandise manufactured to very exacting standards; that the rail herein is carefully constructed to precise measurements; and that it is used to construct track upon which scale model rolling stock such as locomotives (exhibit 3) can run, we have no difficulty in finding that it is, in fact, *model* rail: but we are in accord with defendant that the shipment is not model track and is thereby excluded from classification under item 737.07.

The record is replete with references, oral and documentary, to the separate and distinct nature of track and rail. The aforenoted publications proffered by plaintiffs—the magazine article, pamphlet, and the NMRA manual (we note the data sheets on recommended practices for rail, track work, track and wheel relationships, and standards (track) gage)—all speak to the fact that they are treated as different items. Similarly, plaintiffs' witnesses distinguished between the two, characterizing the rail either as an item used in building track or as a "part of a track."[4]

We also find that the rail is not unfinished track. The fact that the former is dedicated to use in the construction of track is a helpful, but not the sole, criterion for determining whether it is that article in its unfinished state. *American Import Co.* v. *United States*, 26 CCPA 72, T.D. 49612 (1938); *The Harding Co. et al.* v. *United States*, 23

---

[3] General Interpretative Rule 10(h) of TSUS provides that—
For the purposes of these schedules—

\*        \*        \*        \*        \*        \*        \*

(h) unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished;

\*        \*        \*        \*        \*        \*        \*

[4] The first witness, an employee of the importer, agreed, in response to the trial judge's query, that the model trains imported by Pacific "run on tracks constructed from these rails,\* \* \*." Another witness uses the rail at bar "in building all of my track."

CCPA 250, T.D. 48109 (1936); *United States* v. *The Harding Co.*, 21 CCPA 307, T.D. 46830 (1933). Does the rail possess the shape, size, and all of the necessary characteristics of unfinished track, *Nyman & Shultz* v. *United States*, 14 Ct. Cust. Appls. 432, 437, T.D. 42060 (1927); is it so far advanced that it has an individuality which identifies it in its unfinished state as the thing it would be when finished, *Snow's United States Sample Express Co.* v. *United States*, 8 Ct. Cust. Appls. 17, 21, T.D. 37161 (1917); does it have even the "elementary form and substance" of track so that it has reached the point in the manufacturing process where it has become that article "in name and character", *Redden & Martin* v. *United States*, 5 Ct. Cust. Appls. 485, 487, T.D. 35147 (1915)?

The importation meets none of the foregoing criteria: the sample rail in evidence is mute but potent witness to the fact that it possesses neither the shape, size, nor other characteristics which would identify it as track; and the lengthy, detailed steps involved in constructing track from rail cogently illustrate that the latter has not reached the point where it may be considered track in the unfinished state.

The rail stands in marked contrast to those commodities which this court and our court of appeals have held, in the cases cited by plaintiffs, to be "unfinished" articles by reason of their being so far advanced toward their final form and shape that their ultimate purpose and use were self-evident.[5]

Plaintiffs urge that the legislative intent was to include model rail with the named model railroad articles under item 737.07, and assert that it would be anomalous to provide a higher rate for model rail than for model railroad track and rolling stock. It is well settled that resort may be had to legislative history only where a tariff provision is ambiguous. *F. L. Smidth & Company* v. *United States*, 56 CCPA 77, C.A.D. 958 (1969); *Border Brokerage Company, Inc.* v. *United States*, 63 Cust. Ct. 243, C.D. 3903 (1969).

We find no ambiguity in the provision for "track including switching track" and, hence, no need to seek recourse to the Tariff Classification Study material cited by plaintiffs to determine its meaning. Even so, examination of these papers discloses no conflict with the conclusion herein reached. Item 737.07, as originally drafted by the Tariff Commission, provided only for "locomotives and railroad rolling stock,"[6] but was revised in 1962 to include model track and other

---

[5] We note that the strands of beads held to be unfinished jewelry in the recent case of *Kurtz Importing Co.* v. *United States*, 56 CCPA 59, C.A.D. 954 (1969), were ordered in graduated sizes and selected lengths on strands suitable, upon tipping and clasping, for use as single and multi-strand imitation pearl necklaces. Although pearlized and restrung (in the same order) after importation, their ultimate destiny, the court held, was clear.

[6] *Tariff Classification Study, Proposed Revised Tariff Schedules of the United States*, November 15, 1960. This provision was limited to articles containing "by weight over 75 percent of copper, assembled by hand and made to precise scale of the actual article."

specified railroad equipment for the reason that—

> * * * Other types of imports were brought to the attention of the Commission in connection with the public hearing on this first supplemental report in proposed form. The foregoing change in item 737.07 takes into account the latest existing customs practices in regard to this matter. See CAD 746.[7]

The statements and testimony received at this public hearing,[8] held in November, 1961, referred to the scale model HO equipment, such as the locomotives, other railroad rolling stock and sections of *track* which were the subject of *United States* v. *Polk's Model Craft Hobbies, Inc., Lansen-Naeve Corp., et al.*, 47 CCPA 137, C.A.D. 746 (1960),[9] cited by the Tariff Commission. Model rail was not involved in that case, nor alluded to either at the hearing nor in the explanatory notes in the *First Supplemental Report*. Thus, there is no basis for reading into the revised provision an intent to include model rail. Moreover, if Congress had intended to include that article it would have been a simple matter to do so by express language.

Furthermore, we find no anomaly in the fact that a rail may take a higher rate of duty than the completed track section. *Wilbur-Ellis Co.* v. *United States*, 26 CCPA 403, C.A.D. 47 (1939) ; *American Import Co.* v. *United States, supra; Armbee Corporation, W.J. Byrnes & Co., Inc.* v. *United States*, 60 Cust. Ct. 105, C.D. 3278, 279 F. Supp. 438 (1968). Besides, this court may not assume a legislative role to include an article not provided for in the claimed provision. As Judge Watson stated, in an analogous situation, in *Armbee Corporation, W.J. Brynes & Co., Inc.* v. *United States, supra*, at pages 110 *et seq.:*

> The courts are bound to determine the intent of Congress by the language which was actually used and have no right to give any meaning to such language other than that conveyed by the words, terms, or expressions in which the legislative will was expressed. *Edgar Allen Steel Co. (Inc.) et al.* v. *United States*, 16 Ct. Cust. Appls. 26, 29, T.D. 42715. If Congress saw fit, as it apparently did to limit the provision for artificial flowers to those assembled by certain prescribed methods, it is not the function of the court, in construing the relevant statute, to include within the provisions for artificial flowers something which has been expressly excluded. *Edgar Allen Steel* case, *supra.*

We now take up plaintiffs' claim for classification of the rail under item 657.30 as an article of nickel silver. However, this claim must be considered vis-a-vis the district director's presumptively correct classification of the rail as part of a toy. Our resolution of this issue has

---

[7] *Tariff Classification Study, First Supplemental Report,* January, 1962, p. 81.
[8] *Id.,* pp. 294–296, 417–418.
[9] This case, incidentally, belies plaintiffs' assertion that model railroad track is never imported, but is always constructed from rail after importation.

not been made the easier by defendant's divagating position regarding the status of the involved merchandise.

Defendant first asserts in its brief that the rails are parts of tracks and thereby precluded from classification under item 737.07, which has no parts provision. Moreover, the brief continues, the legislative history of the headnotes to Subpart E of Schedule 7, Part 5 indicates an intent to classify parts of tracks "where they are specifically provided for" and "Model rails, it is submitted, are specifically provided for under item 737.90, as parts of toys." [10]

Defendant then proceeds to argue that the rail is merely a *material* for the making of track (which it incidentally characterizes as an "accessory"), and cites cases in support thereof.

The government's ambivalent stance only serves to obfuscate the issues. It fails to explain how a commodity which is "merely a material for the building" of track can be, at the same time, a *part* of a track within the framework of established tariff concepts, or, indeed, a part of a toy (assuming that model track and other model railroad equipment are classifiable as toys under TSUS).

Failing this clarification, we have concluded, upon careful review, that the pieces of rail herein are not parts of track but material for the construction of track. In our opinion, the well-known *Harding* cases, *supra*, are controlling.

The merchandise in the first *Harding*, case, *supra*, was material made of asbestos, yarn and wire, imported in bales of running length to make brake linings for automobile brakes. It was classified as manufactures of asbestos yarn under paragraph 1501(a) of the Tariff Act of 1930 and claimed to be parts of automobiles, finished or unfinished, under paragraph 369(c). All that remained to be done to convert the imported merchandise into automobile brake linings was to cut it to the required lengths to fit the brake shoes and to drill holes in it to correspond with the holes that are on the shoes. The imported material, however, was not marked in any way to indicate where it should be cut, since brake linings normally vary in length. The evidence therein established that the material was capable of being adjusted to other commercial uses; therefore, it could not be held to be dedicated to use as brake linings and was not parts of automobiles, but mere material. However, the court observed (21 CCPA at 310) :

> * * * But, even if it could be said to be dedicated to the exclusive use of making brake linings for automobiles, it would be, nevertheless, a mere material for such use, just as silk cloth in the

---

[10] In giving this novel, if not tongue in cheek, interpretation of the basket provision for toys and parts of toys, "not specially provided for", defendant apparently overlooked its earlier refusal to concede that the item is model rail.

piece, designed to be used as linings for clothing, is a mere material out of which such linings are to be cut.

The record in the second *Harding* case, *supra*, established that the identical merchandise was used exclusively in the manufacture of brake lining for automobiles and was commercially unsuitable for other uses. However, this factor did not change the essential nature of the importation, the court held, stating (23 CCPA at 252 *et seq.*) :

> As long as the merchandise is not cut before importation or is not marked when imported so that nothing remains to be done to make it an automobile brake lining except to cut it into pieces of predetermined length, we regard it as wholly immaterial that the cutting of the roll is delayed until it is fixed to and riveted upon the brake shoe. *In the condition as imported, the long roll of brake-lining material has in no manner been dedicated to the making of any particular brake lining.* To be a part of an automobile, that is a brake lining, it must be more than mere material for making a brake lining. [Emphasis supplied.]
>
> \*    \*    \*    \*    \*    \*    \*
>
> Running through most of the decisions pertinent to the inquiry here, it is made clear that before imported merchandise shall be regarded as parts of an article *the identity of the individual article must be fixed with certainty.* This is not true in the case at bar, and we hold as we held in the former *Harding* case that the imported merchandise is material for making automobile brake linings and is not parts of automobiles. [Emphasis copied.]

It is patent that the rail at bar has in no manner been dedicated to the making of any particular track and that the identity of the individual article has not been fixed with certainty. See also *American Import Co.* v. *United States, supra; F.H. Paul & Stein Bros., Inc.* v. *United States,* 44 Cust. Ct. 130, C.D. 2166 (1960) ; *B.F. Goodrich Company* v. *United States,* 38 Cust. Ct. 72, C.D. 1845 (1957).

The rail, of course, bears no marks where cutting can take place, as each railroad hobbyist may construct his own individual track layout. Thus, although their ultimate destiny is certain, their specific use in any particular trackwork is indeterminate at the time of importation : they are even further removed from consideration as parts than the brake lining material in the *Harding* cases.

As we find that the rail is only material for the making of track and not a part thereof, we are constrained to hold, under the authority of the second *Harding* case, *supra*, that its classification as *part* of a toy under item 737.90 is erroneous. Therefore, we need not reach the question whether model track constructed from Code 70 rail is a toy. *Davies, Turner & Co.* v. *United States,* 61 Cust. Ct. 311, C.D. 3621, 292 F. Supp. 722 (1968).

Plaintiffs' claim for classification under item 657.30 as nickel silver must be considered in connection with the Subpart C headnotes of

Schedule 6, Part 2, which define alloys of copper and nickel silver as follows:

    *        *        *        *        *        *        *

2. For the purposes of the tariff schedules, the following terms have the meanings indicated:

(a) <u>Alloys of copper</u>: Copper-base alloys or metals in which the copper content is, by weight, less than 99.3 percent, but not less than any other metallic element. For the purposes of this subpart—

(i) <u>nickel silver</u> is an alloy of copper which contains by weight 5 percent or more zinc and 5 percent or more of nickel, with or without small quantities of other elements;

    *        *        *        *        *        *        *

In the absence of context which requires otherwise, the term "copper", wherever used in the tariff schedules, includes alloys of copper.

    *        *        *        *        *        *        *

The rail at bar comes within the foregoing headnote definitions, plaintiffs' claim, as shown by the Customs Laboratory Report dated February 12, 1968, which was received in evidence herein.[11] It reads as follows:

The sample has this composition, by weight:

| | |
|---|---|
| Copper | 62. 5% |
| Nickel | 11. 9% |
| Zinc (by difference) | 25. 6% |
| | 100. 0% |

Spectrographic analysis shows traces of silver, iron and manganese are also present.

Schedule 6, Part 2, Subpart C, Headnote 2(a)(i), TSUS, noted.

The Report, which stands uncontroverted, establishes that the merchandise at bar is an alloy of copper, specifically, nickel silver, as defined hereinabove.

Defendant contends, however, that to obtain classification under item 657.30, plaintiffs must first bring the importation within the confines of its superior heading, "Articles of copper, not coated or plated with precious metal" and that, in order to do this, plaintiffs "must prove that the merchandise at bar is in chief *value* of copper."

---

[11] At the conclusion of the trial, a portion of the sample rail was sent to the United States Customs Laboratory at San Francisco for identification and determination of percentage by weight of each metal present, with the understanding that the chemist's report would be filed with the court and considered as part of the record.

[Emphasis copied.] Defendant cites in support thereof Rule 9(f)(i) of the General Headnotes and Rules of Interpretation which reads—

> 9. Definitions. For the purposes of the schedules, unless the context otherwise requires—
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*
>
> (f) the terms "of", "wholly of", "almost wholly of", "in part of" and "containing", when used between the description of an article and a material (e.g., "furniture of wood", "woven fabrics, wholly of cotton", etc.), have the following meanings:
>
> (1) "of" means that the article is wholly or in chief value of the named material;
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*

and General Interpretative Rule 10(f) which provides that—

> (f) an article is in chief value of a material if such material exceeds in value each other single component material of the article;

Thus, argues defendant, it was incumbent upon plaintiffs to establish that the merchandise is in chief value of copper, which can only be proved by showing "the costs of the various component elements."

We cannot accept defendant's reasoning: even a cursory review of the provisions and headnotes in Part 2 of Schedule 6, and the pertinent materials in the *Tariff Classification Study, Schedule 6*, November 15, 1960 (prepared by the United States Tariff Commission and regarded by the courts as a source of legislative history, *W. R. Filbin & Co., Inc.* v. *United States*, 63 Cust. Ct. 200, C.D. 3897 (1969)), would reveal to the uninitiate the unmistakably clear legislative intent to classify base metal alloys on the basis of the component material predominating by *weight* (with the exception of certain ferroalloys and master alloys), and to abandon the former practice, under the Tariff Act of 1930, of classifying them on the basis of the component metal of chief value.

Headnote 2 of Schedule 6, Part 2 provides as follows:

> 2. Alloys.—(a) For the purposes of the tariff schedules, alloys are defined and classifiable as hereinafter set forth. Alloys are metallic substances consisting of two or more metals, or of one or more metals and one or more non-metals, intimately united, usually by having been fused together and which may or may not have been dissolved in each other when molten; they include sintered mixtures of metal powders and heterogeneous intimate mixtures obtained by fusion, but do not include substances in which the total weight of the metals does not equal or exceed the total weight of the non-metal components.

(b) <u>Precious-metal alloys</u> are alloys which contain 2 percent or more by weight of one or more metals of the platinum group, of gold, or of silver. * * *

(c) <u>Base-metal alloys</u> are alloys which contain one or more base metals and are not any of the precious-metal alloys, as defined in (b) of this headnote. Base-metal alloys are classifiable as—

> (i) alloys of that base metal *which predominates by weight* over each of the other metallic elements contained therein, except as specified in (c)(ii) of this headnote; [emphasis supplied] and

> (ii) ferroalloys (as defined in headnote 2(e) of subpart B of this part) or master alloys (as defined in headnote 2(b) of subpart C of this part) under their respective headings in subpart B or C of this part, regardless of the base metal therein which predominates by weight.

(d) In the tariff schedules, unless the context requires otherwise, a provision for a specific metal includes that metal and its alloys.

The Explanatory Notes to Schedule 6 of the *Study, supra,* state, with respect to Part 2, at pages 86 *et seq.:*

> Despite the fact that the products provided for in this part are of tremendous importance in international trade, the existing provisions with respect to their tariff treatment are fragmentary, overlapping, and disorganized, and because of their ambiguity are frequently involved in classification disputes and litigation. * * *

> In the existing schedules, base metal alloys are classified according to their component metal of chief value rather than on the almost universally accepted practice of classifying them according to the component metal which predominates by weight over each of the other metal components. Further, whether a product consisting of an ad-mixture of metals is classified for tariff purposes as an alloy or under a provision such as "zinc in blocks" or "zinc in sheets" depends upon an illusory, undefined commercial practice with respect to such product (TD 54999(23)). In the present tariff act, numerous tariff descriptions are based upon specific named alloys such as pewter, brass, bronze, *nickel silver*, babbitt metal, type metal, and solder, without any indication as to the specifications for such alloys. [Emphasis supplied.]

\*         \*         \*         \*         \*         \*         \*

> The proposed provisions in part 2 are presented in an organized, systematic manner and the subject matter is covered completely. Part 2 is subdivided into 10 subparts. Subpart A covers precious metals and the remaining subparts cover base metals. Subparts B through H cover iron and steel, copper, aluminium, nickel, tin, lead, and zinc respectively, and the last two subparts cover all

of the remaining base metals. Headnote 2 of schedule 6 specifically names each of the elements which is to be regarded as a base metal and as a precious metal. All of the metals provided for in part 2 are included even when they are chemically pure.

The provisions of headnote 2 to this part objectively define alloys including precious-metal alloys and base-metal alloys. Aside from clarifying changes in language, headnote 2 is the same as it was when it was published for public hearings. *The definitions involve a change from distinctions based on component metal of chief value to objective distinctions based on weight. This change is essential to proper and orderly classification.* No objections were raised against this proposal, and it is believed that the incidental rate changes which may be involved will not significantly affect trade. Detailed specifications with respect to the alloys of each of the base metals are included in the provisions of the respective subparts. [Emphasis supplied.]

The Explanatory Notes to Subpart 6, Part 2 of the *Study* state, at page 96, that nickel silver is one of the four categories of copper alloys defined in headnote 2 thereof, and that the specifications for these alloys "conform substantially with trade understanding and their inclusion in the proposed provisions should dispel the existing uncertainty concerning their tariff status."

Thus, Rules 9(f)(i) and 10(f) are inapplicable herein in light of the stated legislative intent to define nickel silver in terms of the weight of its component materials.

For the foregoing reasons we find that the merchandise at bar consists of articles of copper alloy, specifically, nickel silver, within the intendment of TSUS item 657.30 and is properly dutiable at 1.275 cents per pound and 22.5 per centum ad valorem. To that extent the protest is sustained: the claim under item 737.07 is overruled and the claim under item 657.35 is dismissed.

Judgment will be entered accordingly.

---

(C.D. 3939)